Jorge F. Coombs, Esquire *(NJ Attorney ID # 017962002)*
YOUNGBLOOD FRANKLIN
SAMPOLI & COOMBS, P.A.
1201 New Road, Suite 230
Linwood, NJ  08221
Tel:     (609) 601-6600
Fax:     (609) 601-6601
E-mail: jcoombs@youngbloodlegal.com
*Attorney for Plaintiffs*

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
### (CAMDEN VICINAGE)

_____

**H. FRANK FIFE** and **JOHN G. AND ELIZABETH STEELMAN FOUNDATION**,

              Plaintiffs

       v.

**WILLIAM P. BARR**, in his official capacity as Attorney General of the United States and executive of the U.S. Department of Justice;

**KEVIN K. MCALEENAN**, in his official capacity as Acting Secretary of the U.S. Department of Homeland Security;

**KEVIN K. MCALEENAN**, in his official capacity as Commissioner of U.S. Customs and Border Protection;

**MARK A. MORGAN**, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; and

**JUDSON W. MURDOCK, II**, in his official capacity as Houston CBP Director of Field Operations, individually, jointly, separately and in the alternative,

              Defendants

_____

CIVIL ACTION

CASE NO.: _____

**COMPLAINT
AND
DEMAND FOR JURY TRIAL**

Plaintiffs, H. Frank Fife and the John G. and Elizabeth Steelman Foundation, hereby file the following complaint against Defendants as captioned above.

## **PARTIES**

1.      Plaintiff H. Frank Fife (hereinafter referred to as "Plaintiff Fife") is a citizen of the United States who at all material times herein resided at 2222 Gramercy Avenue in the City of Linwood, County of Atlantic, and State of New Jersey.

2.      Plaintiff John G. and Elizabeth Steelman Foundation (hereinafter referred to as "Plaintiff Foundation") is a federally-approved 26 U.S.C. § 501(c)(3) non-profit charitable organization formed in 2004 and at all material times herein operated in the City of Linwood, County of Atlantic, and State of New Jersey.

3.      Defendant William P. Barr is Attorney General of the United States and executive of the U.S. Department of Justice (hereinafter referred to as the "DOJ"), the federal executive department responsible for the enforcement of law and administration of justice in the United States.  Defendant Barr is an agent, servant, employee and/or representative of the DOJ and in his official capacity has supervisory authority and accountability for the procedures and actions of said department.  The DOJ maintains Northeastern Regional Offices in New York, New York, with jurisdiction over all federal matters with venue in New Jersey.

4.      Defendant Kevin K. McAleenan is Acting Secretary for the U.S. Department of Homeland Security (hereinafter referred to as "DHS"), a cabinet department concerned with the public security of the United States.  Among DHS' stated missions are border security and immigration enforcement.  Defendant McAleenan is an agent, servant, employee and/or representative of DHS and in his official capacity has supervisory authority and accountability

for the procedures and actions of said department.  DHS maintains an office at 111 Town Square Place in the City of Jersey City, New Jersey, and a Regional Operations Intelligence Center in Southern New Jersey.

5.      Defendant Kevin K. McAleenan is Commissioner for U.S. Customs and Border Protection (hereinafter referred to as "CBP"), a federal law enforcement agency within DHS. CBP's stated mission is enforcement of United States immigration laws and regulations. Defendant McAleenan is an agent, servant, employee and/or representative of CBP and in his official capacity has supervisory authority and accountability for the procedures and actions of said department.  CBP maintains numerous offices throughout the State of New Jersey.

6.      Defendant Mark A. Morgan is Acting Director for U.S. Immigration and Customs Enforcement (hereinafter referred to as "ICE"), a federal law enforcement agency within DHS. ICE is charged with investigation and enforcement of federal statutes within the United States and at diplomatic missions overseas.  Defendant Morgan is an agent, servant, employee and/or representative of ICE and in his official capacity has supervisory authority and accountability for the procedures and actions of said agency.  ICE maintains numerous offices throughout the State of New Jersey.

7.      Defendant Judson W. Murdock, II is Houston CBP Director of Field Operations and has supervisory authority over CBP operations at the George Bush Intercontinental Airport in Houston, Texas.  Defendant Murdock is an agent, servant, employee and/or representative of CBP and in his official capacity has supervisory authority and accountability for the procedures and actions of Houston CBP Field Operations.  CBP maintains numerous offices throughout the State of New Jersey.

## JURISDICTION

8.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.  The instant action arises under the Constitution of the United States, the Immigration and Nationality Act ("I.N.A."), 8 U.S.C. § 1101 *et seq.*, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("I.I.R.I.R.A."), Pub. L. No. 104-208, 110 Stat. 1570, and the Administrative Procedure Act ("A.P.A."), 5 U.S.C. §.701 *et seq.*  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1361, and 2201.  This Court may grant relief pursuant to 28 U.S.C. §§ 1361, 2201, 2202, and 5 U.S.C. § 701 *et seq.*

9.      The instant action also seeks redress for deprivation of Plaintiffs' constitutional rights under the Due Process Clause of the Fifth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

## VENUE

10.      Venue is proper in the United States District Court for the District of New Jersey, located in the City of Camden, pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situate, in the County of Atlantic within the State of New Jersey.  In addition, Plaintiffs reside in this judicial district and defendants maintain offices and operations in said district. 28 U.S.C. § 1391(e).  Furthermore, Defendants are all agents, servants, employees and/or representatives of departments or agencies of the United States government, acting in their official capacity under color of federal legal authority.

## APPLICABLE LAW AND POLICY

### Constitutional Authority and the Immigration and Nationality Act

11.     The federal government's broad constitutional powers to regulate the admission and removal of non-citizens from the territories of the United States has long been identified in Article I, § 8, Clause 3 (the Commerce Clause); Article I, § 8, Clause 4 (the Naturalization Clause); Article I, § 8, Clause 11 (the War Power Clause); and Article I, § 9, Clause 1 (The Migration and Importation Clause) of the United States Constitution.  Pursuant to said powers, the 82nd United States Congress enacted the Immigration and Nationality Act of 1952 (referred hereafter as the "I.N.A." and codified at 8 U.S.C. Chapter 12).  The I.N.A. governs the immigration and citizenship requirements of the United States.  Most relevant to the instant matter, I.N.A. § 214.2(f) outlines special requirements for the admission, extension, and maintenance of status of nonimmigrant students enrolled in colleges and universities in the United States.  These are commonly known as "F-1" nonimmigrant student visas.

12.     In relevant part, I.N.A. § 101(a)(15)(F)(i) [8 U.S.C. § 1101] defines a "nonimmigrant student" as:

> (A)n alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study consistent with section 1184(l) of this title at an established college, university,… which institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn…

13.     The I.N.A. provides for several categories of "nonimmigrant students," among them § 214.2(f)(1)(i) which outlines the requirements for admission under an F-1 nonimmigrant student visa:

A nonimmigrant student may be admitted into the United States in nonimmigrant status under section 101(a)(15)(F) of the Act, if:

(A) The student presents a SEVIS Form I-20 issued in his or her own name by a school approved by the Service for attendance by F-1 foreign students…;

(B) The student has documentary evidence of financial support in the amount indicated on the SEVIS Form I-20…;

(C) For students seeking initial admission only, the student intends to attend the school specified in the student's visa…; and

(D) In the case of a student who intends to study at a public secondary school, the student has demonstrated that he or she has reimbursed the local educational agency that administers the school for the full, unsubsidized per capita cost of providing education at the school for the period of the student's attendance.

14.     I.N.A. § 214.2(f)(4)(i) also contains mechanisms for temporary leaves of absence for F-1 nonimmigrant student visa holders.  In relevant part it states:

An F-1 student returning to the United States from a temporary absence of five months or less may be readmitted for attendance at a Service-approved educational institution, if the student presents:

(i) A current SEVIS Form I-20… properly endorsed by the DSO for reentry if there has been no substantive change to the most recent Form I-20 information…

15.     In addition, I.N.A. § 214.2(f)(16)(i) outlines the criteria for reinstating nonimmigrant student visa status after a prolonged absence from the United States:

(16) Reinstatement to student status –

(i)     General - The district director may consider reinstating a student who makes a request for reinstatement on Form I-539, Application to Extend/Change Nonimmigrant Status, accompanied by a properly completed SEVIS Form I-20 indicating the DSO's recommendation for reinstatement... The district director may consider granting the request if the student:

(A)     Has not been out of status for more than 5 months at the time of filing the request for reinstatement (or demonstrates that the failure to file within the 5 month period was the result of exceptional

circumstances and that the student filed the request for reinstatement as promptly as possible under these exceptional circumstances);

(B)   Does not have a record of repeated or willful violations of Service regulations;

(C)   Is currently pursuing, or intending to pursue, a full course of study in the immediate future at the school which issued the Form I-20;

(D)   Has not engaged in unauthorized employment;

(E)   Is not deportable on any ground other than section 237(a)(1)(B) or (C)(i) of the Act; and

(F)   Establishes to the satisfaction of the Service, by a detailed showing, either that:

(1) The violation of status resulted from circumstances beyond the student's control. Such circumstances might include serious injury or illness, closure of the institution, a natural disaster, or inadvertence, oversight, or neglect on the part of the DSO, but do not include instances where a pattern of repeated violations or where a willful failure on the part of the student resulted in the need for reinstatement; or

(2) The violation relates to a reduction in the student's course load that would have been within a DSO's power to authorize, and that failure to approve reinstatement would result in extreme hardship to the student.

16.     Pursuant to 8 C.F.R. § 214.1(b)(1), Defendants also have to follow "automatic revalidation" procedures for expired F-1 nonimmigrant visas:

Under the automatic revalidation provision of immigration law, certain temporary visitors holding expired nonimmigrant visas who seek to return to the U.S. may be admitted at a U.S. port-of-entry by CBP, if they meet certain requirements, including, but not limited to the following:

-       Nonimmigrants who departed the United States for brief travel to Canada, Mexico, or an adjacent island (for F and J nonimmigrants) for thirty days or less;

- Nonimmigrants with a valid (unexpired) admission stamp or paper Form I-94, Arrival/Departure Record, endorsed by DHS.
*(https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visa-expiration-date/auto-revalidate.html)*

17.    Plaintiffs assert that at all relevant times herein their student designee complied with all

I.N.A. admissibility requirements to maintain valid F-1 nonimmigrant student visa status.

### 8 U.S.C. § 1101(a)(15)(H) – H-1B Visas Are Temporary Nonimmigrant Work Visas

18.    In relevant part, 8 U.S.C. § 1101(a)(15)(H) defines aliens with H-1B visas:

(a) As used in this chapter-
…
(15) The term "immigrant" means every alien *except* an alien who is within one of the following classes of nonimmigrant aliens-
…
(H) an alien… who is coming temporarily to the United States to perform services… in a specialty occupation described in section 1184(i)(1) of this title… who meets the requirements for the occupation specified in section 1184(i)(2) of this title or… is of distinguished merit and ability, and with respect to whom the Secretary of Labor determines and certifies to the Attorney General that the intending employer has filed with the Secretary an application under section 1182(n)(1) of this title… who is engaged in a specialty occupation described in section 1184(i)(3) of this title, and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 1182(t)(1) of this title…

*(Emphasis added)*

**8 U.S.C. § 1324a - Unlawful Employment of Aliens**

19.     Defendants accused Plaintiff Fife, without giving him notice or opportunity to defend, of engaging in the unlawful employment of an alien.  Specifically, Defendants alleged Plaintiff Fife provided his student designee with F-1 nonimmigrant student visa sponsorship as "fee-for-service" employment in violation of federal statute.

20.     In relevant part, 8 U.S.C. § 1324a states:

> (a) Making employment of unauthorized aliens unlawful
>
>> (1) In general - It is unlawful for a person or other entity-
>>
>>> (A) to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3)) with respect to such employment
>>> …
>>
> (h) Miscellaneous provisions
>> …
>>> (3) Definition of unauthorized alien
>>> As used in this section, the term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General.

**U.S. State Department and Internal Revenue Service Guidance**

21.     Defendants' assertions of unlawful and unauthorized employment are untenable given their F-1 student visa program promotional materials highlight a sponsor's ability to pay for tuition costs:

> Can organizations or individuals sponsor an F-1 student to attend public secondary school?
>
> Yes. Nothing in the law prevents an organization or an individual from paying the full tuition costs for the student.  However, the payment cannot come from public funds.  The student must still show that he or she has

sufficient funds to cover education and living expenses while in the United States.

*(https://travel.state.gov/content/travel/en/us-visas/study/student-visa/foreign-students-in-public-schools.html)*

22.     Pursuant to Internal Revenue Service (hereinafter referred to as "IRS") Tax Topic Number 421, Defendants failed to recognize that:

A scholarship is generally an amount paid or allowed to a student at an educational institution for the purpose of study… (i)f you receive a scholarship… all or part of the amounts you receive may be tax-free… if you meet the following conditions:

- You (are) a candidate for a degree at an educational institution that maintains a regular faculty and curriculum and normally has a regularly enrolled body of students in attendance at the place where it carries on its educational activities; and

- The amounts you receive are used to pay for tuition and fees required for enrollment or attendance at the educational institution, or for fees, books, supplies, and equipment required for courses at the educational institution.

*(www.irs.gov/taxtopics/tc421)*

23.     Furthermore, Plaintiff Foundation is a 26 U.S.C. § 501(c)(3) non-profit charitable organization founded in 2004 which awards grants and scholarships pursuant to the following IRS conditions and requirements:

Grants to individuals for travel, study, or other similar purposes (including loans made for charitable purposes, and program-related investments) are taxable expenditures, *unless* the following conditions are met:

1. The grant is awarded on an objective and nondiscriminatory basis…, and

2. It is shown… that one of the following requirements is met-

a. The grant is a scholarship… and is to be used for study at an educational institution that normally maintains a regular faculty and curriculum and normally has a regularly organized body of students in attendance at the place where the educational activities are carried on. For these purposes, grant recipients need not be limited to degree candidates, nor must the grant be limited to tuition, fees, and course-required books, supplies and equipment. A recipient may use grant funds for room, board, travel,

research, clerical help or equipment, that are incidental to the purposes of
the scholarship or fellowship grant.
*(www.irs.gov/charities-non-profits/private-foundations/grants-to-individuals)*

24.     Plaintiffs assert that, at all relevant times herein, the sponsorship and scholarships provided were neither income nor fee-for-service to their student designee and complied with all applicable I.N.A. and IRS conditions and requirements.

25.     As a direct consequence of Defendants' actions and procedures, Plaintiff Fife was labeled an unlawful and unauthorized alien employer and his student designee was erroneously determined to be an intending immigrant.  The student designee was summarily removed from the United States and was imposed a five (5) year ban on reentry for alleged "immigrant" visa document violations.


**Federal Hegemony Balanced Against Constitutional Rights**

26.     Plaintiffs acknowledge that the United States Supreme Court has long identified the admission and exclusion of foreign nationals as a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell* 430 U.S. 787 (1977), 792.  Even so, the Court has recognized that:

> (A)lthough foreign nationals seeking admission have no constitutional right to
> entry, this Court has engaged in a circumscribed judicial inquiry when the denial
> of a visa allegedly burdens the constitutional rights of a U.S. citizen.
> *Trump v. Hawaii*, 138 S.Ct. 2392 (2018) at 2419.

27.     Such judicial inquiries have been undertaken by the Court to review whether the Executive Branch of government provided "facially legitimate and bona fide" reasons for denying a foreign national entry into the United States. *Kleindienst v. Mandel*, 408 U.S. 753 (1972), 769.  Adding to the language of *Kleindienst v. Mandel*, the Court held that:

> "(W)hen the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens.
>
> *Trump v. Hawaii*, 138 S.Ct. 2392 (2018) at 2419.

28.     The Court has routinely refused to "look behind" executive discretion to balance the justifications for negative action against the constitutional interests of U.S. citizens and entities. In *Knauff v. Shaughnessy*, 338 U.S. 537 (1950) the Court held that an alien wife of a U.S. citizen seeking admission could be denied a hearing and ordered excluded on the Attorney General's judgment that her admission would "endanger the public security" and would be "prejudicial to the interests of the United States."  More recently, in *Kerry v. Din*, 576 U.S. ___ (2015), the Court found no need to balance a petitioner's protected liberty interest against government interests because it held the notice received satisfied due process.

### Defendants' Actions Fail the Facially Legitimate and Bona Fide Standard

29.     The case at bar is distinguishable from the aforementioned Supreme Court decisions, where immigrants sought permanent admission to the United States, because Plaintiffs sponsored and provided scholarships to an F-1 nonimmigrant student visa holder.  Unlike the aforementioned immigrant visa cases, Plaintiffs have constitutionally protected liberty interests in F-1 student visa program participation.  Plaintiffs also have constitutionally protected property interests in the sponsorship and scholarship monies they provided to a student designee to attend a qualified educational institution.

30.     Unlike *Kleindienst v. Mandel*, *Knauff v. Shaughnessy*, and *Kerry v. Din*, the instant case involves no public safety, national security, terrorist, or subversion concerns prejudicial to the interests of the United States.  Plaintiffs concede that suspected public safety, national security,

terrorist, or subversive interests are clearly "facially legitimate and bona fide" reasons for Defendants to deny entry to a foreign national.  Instead, the case at bar requires a balancing of Plaintiffs' constitutionally protected liberty and property interests against the alleged "facially legitimate and bona fide" reasons cited by Defendants when they denied Plaintiffs' student designee admission to the United States.

31.     The facts of the instant matter further distinguish it from *Kerry v. Din*, where a consular notice containing citations of relevant I.N.A. code sections satisfied the "facially legitimate and bona fide standard."   In this case, CBP cited a facially incorrect I.N.A. code section for the violation allegedly committed by Plaintiffs and their student designee.  Defendants' Form I-860 Determination of Inadmissibility, dated July 29, 2017, cited only I.N.A. § 212(a)(7)(A)(i)(I), which in relevant part reads:

> Except as otherwise specifically provided in this chapter, any *immigrant* at the time of application for admission-
>
> > (I) who is not in possession of a *valid unexpired immigrant visa*, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 211(a) of this title… is inadmissible.
>
> > > > > *(Emphasis added)*

I.N.A. § 212(a)(7)(B)(i)(II), which was not used by Defendants, would have been more on point to the facts and allegations they made, as it reads:

> Any *nonimmigrant* who-
> > …
> > (II) is not in possession of a *valid nonimmigrant visa* or border crossing identification card at the time of application for admission, is inadmissible.
> > > > > *(Emphasis added)*

32.     Plaintiffs' student designee was classified by Defendants as an "intending immigrant" instead of as a "nonimmigrant" suspected of improper documentation.  The existence of more suitable statutes shows Defendants' use of I.N.A. § 212(a)(7)(A)(i)(I) was, at best, arbitrary and capricious and, at worst, malicious.    As such, Defendants' use of I.N.A. § 212(a)(7)(A)(i)(I) on Form I-860 Determination of Inadmissibility fails the "facially legitimate and bona fide standard" required by the Court in *Kleindienst v. Mandel*.

**Lack of Notice to Plaintiffs Violates Fifth Amendment Due Process Protections**

33.     Defendants' use of I.N.A. § 212(a)(7)(A)(i)(I) on the July 30, 2017 Form I-860 Determination of Inadmissibility, when CBP's internal documentation points to allegations of unlawful nonimmigrant employment, supports Plaintiffs' contention that Defendants' stated reasons for denied admission fail the "facially legitimate and bona fide standard" and are specific evidence of Defendants' unconstitutional, and bad faith, acts. *Bustamante v. Mukasey*, 531 F.3d 1059 (9th Cir. 2008)

34.     Irrespective of the I.N.A. code section cited, Defendants never provided Plaintiffs with notice of their conclusions or a copy of the July 30, 2017 Form I-860 Determination of Inadmissibility.    In doing so, Defendants deprived Plaintiffs of fair notice and other constitutionally protected liberty and property interests without procedural due process as required by the Due Process Clause of the Fifth Amendment of the United States Constitution. In relevant part, the Fifth Amendment provides that:

> No person shall… be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**The Vagueness Standard**

35.    Plaintiffs argue that Defendants arbitrarily and capriciously deprived them of constitutionally protected liberty and property interests without procedural due process.  Such deprivations result in an environment rife with vague statutory language and procedures.  The Court in *Connally v. General Construction Co.*, 269 U.S. 385 (1926) at 391, held:

> (t)hat the terms of a… statute… must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law, and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

36.    The majority in *Connally*, quoting *United States v. Capital Traction Co.*, 34 App. D.C. 592 at 598, further stated "… (t)he dividing line between what is lawful and unlawful cannot be left to conjecture."

37.    Several decades later, the Court in *Kolender v. Lawson*, 461 U.S. 352 (1983) at 356, clarified that:

> (a)s generally stated, the void-for-vagueness doctrine requires that a… statute define the… offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

38.    The Court in *Kolender* at 358, citing *Smith v. Goguen*, 415 U.S. 566 (1974), 574 and 575, held:

> (w)e have recognized recently that the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine - - the requirement that a legislature establish minimal guidelines to govern law enforcement'" and in the absence of such minimal guidelines, vague statues may permit law enforcement "to pursue their personal predilections."

39.    The *Kolender* majority voiced concern that when law enforcement is afforded "virtually complete" discretion to interpret statutes through vague procedures, the potential for arbitrary

suppression of constitutionally protected liberties is created.  As in the case at bar, blanket law enforcement discretion created a "convenient tool" for harsh, discriminatory, and arbitrary enforcement.

### Application of the Void-For-Vagueness Doctrine to Immigration Matters

40.     The Supreme Court in *Jordan v. De George*, 341 U.S. 223 (1951) held that:

> (d)espite the fact that this is not a criminal statute, we shall nevertheless examine the application of the vagueness doctrine… in view of the grave nature of deportation.

41.     The *Jordan* Court again cited the *Connally* vagueness standard:

> The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.

42.     More recently, in *Sessions v. Dimaya*, 584 U.S. ___ (2018) on page 4, the Court quoting *Johnson v. United States*, 576 U.S. ___ (2015), held that:

> (t)he prohibition of vagueness in criminal statutes… is an 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law" and further states "(t)he void-for-vagueness doctrine, as we have called it, guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes… (a)nd the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges.

43.     The *Dimaya* majority reiterated "that deportation is a 'particularly severe penalty,' which may be of greater concern to… (an) alien than 'any potential jail sentence'." 584 U.S. ___ (2018) at 6.

44.     The Court in *Dimaya* restated that unconstitutionally vague statutes and procedures result in "more unpredictability and arbitrariness than the Due Process Clause tolerates" and such vagueness "'devolv(es) into guesswork and intuition,' invite(s) arbitrary enforcement, and fail(s) to provide fair notice." 584 U.S. ___ (2018) at 11 and 24.

45.     Justice Gorsuch, citing James Madison regarding the types of rights which require due process before they can be infringed, concurred:

> [If… the constitution, statute, or regulation creates a liberty or property interest, then the second step - determining 'what process is due' - comes into play]. Madison made this very point, suggesting an alien's admission in this country could in some circumstances be analogous to 'the grant of land to an individual,' which 'may be of favor not of right; but the moment the grant is made, the favor becomes a right, and must be forfeited before it can be taken away.'
>
> 584 U.S. ___ (2018) Concurrence page 13.

46.     Justice Gorsuch's concurrence cited *Johnson v. United States*, 576 U.S. ___ (2015), holding a statutory provision "void for vagueness because it invited 'more unpredictability and arbitrariness' than the Constitution allows." 584 U.S. ___ (2018) Concurrence page 2.   The concurrence further stated:

> Perhaps the most basic of due process's customary protections is the demand of fair notice and indicates that fair notice also applies to civil cases and statutes affecting a person's life, liberty, or property.
>
> 584 U.S. ___ (2018) Concurrence page 3.

47.     Justice Gorsuch, again citing James Madison, agreed that:

> (w)ithout an assurance that the laws supply fair notice, so much else of the Constitution risks becoming only a 'parchment barrie[r]' against arbitrary power.
>
> 584 U.S. ___ (2018) Concurrence page 7.

48.     Clarifying the application of fair notice to civil and, more specifically, immigration law, Justice Gorsuch opined:

> … in the criminal context this Court has generally insisted that the law must afford 'ordinary people… fair notice of the conduct it punishes'…(a)nd I cannot see how the Due Process Clause might often require any less than that in the civil context either.  Fair notice of the law's demands, as we've seen, is 'the first essential of due process.'
>
> 584 U.S. ___ (2018) Concurrence page 10.

49.     The concurrence also clarified fair notice is an essential part of due process and, among the procedures employed by the government:

> … however summary those procedures might be, it's hard to fathom why fair notice of the law – the most venerable of due process's requirements – would not be among them.
>
> 584 U.S. ___ (2018) Concurrence page 14.

50.     Justice Gorsuch spelled out that the:

> (v)agueness doctrine represents a procedural, not substantive, demand.  It does not forbid the legislature from acting toward any end it wishes, but only requires it to act with enough clarity that reasonable people can know what is required of them…
>
> 584 U.S. ___ (2018) Concurrence page 18.

51.     Justice Gorsuch further warned that Executive Branch actions outside of clearly defined statutes and procedures threaten the "checks and balances" created by the separation of powers, as:

> (v)ague laws also threaten to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's contours through their enforcement decisions.
>
> 584 U.S. ___ (2018) Concurrence page 8.

## Legal Basis for 42 U.S.C. § 1983 Actions

52.     42 U.S.C. § 1983 allows Plaintiffs to initiate a civil action for deprivation of rights under the Fifth Amendment:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

**Factors for Determining Due Process Required in a Particular Situation**

53.     The Supreme Court in *Morrissey v. Brewer*, 408 U.S. 471 (1972) at 481, recognized in its holding that "due process is flexible and calls for such procedural protections as the particular situation demands."  When assessing what process is due in a "particular situation," involving competing government and private interests, the Court relies on an analysis they outlined in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  *Mathews v. Eldridge* established three (3) factors for such inquiries: 1) the nature of the private interests that will be affected by government action; 2) the risk of an erroneous deprivation of such interests through the procedures used, and the probable value of additional or substitute procedures; and 3) the burden such procedures would present to the government, both in fiscal and administrative terms.

54.     With regard to the first *Mathews v. Eldridge* factor, Plaintiffs have a strong private interest in minimizing the chances of being wrongfully accused of unlawful employment of an F-1 nonimmigrant student visa holder.  In addition, Plaintiffs have calculable private interests invested in the F-1 nonimmigrant student visa program.  The time, money, and resources expended by private entities and individuals participating in the F-1 visa program are plainly private property.  The Fifth Amendment's Due Process Clause explicitly protects private property rights.  Moreover, Defendants target and promote small business owner participation in the Optional Practical Training Extension for STEM (Science, Technology, Engineering, and Mathematics) Students (hereinafter referred to as "STEM OPT") and cite benefits such as:

- Enhancing economic, scientific and technological competitiveness through increased research, innovation and knowledge.

- Creating positive spillover effects as a result of increased productivity by STEM OPT students.

- Increasing understanding and knowledge of markets in STEM OPT students' home countries through added cultural diversity and exchange.
  (*https://studyinthestates.dhs.gov/why-stem-opt-is-good-for-small-business*)

Clearly, Plaintiffs had private interests in the future benefits an F-1 student visa holder participating in STEM OPT training could provide.

55.     As to the second *Mathews v. Eldridge* factor, the procedures utilized by Defendants in this matter needlessly risked erroneous deprivation of Plaintiffs' private interests.  Plaintiffs were not noticed of Defendants' allegations of unlawful student designee employment and the student designee was denied admission without Plaintiffs being given an opportunity to refute same. The probative value of additional or substitute procedures, such as a holding a hearing by a neutral magistrate or officer thirty (30) days after the F-1 student's presentment for admission to determine if Defendants' allegations of unlawful employment can to be substantiated, are self-evident.  This second factor further distinguishes the instant case from *Kerry v. Din*, as Plaintiffs have a clearly identifiable, and calculable, claim that Defendants' denial of their student designee's entry deprived them of liberty and property interests without procedural due process.

56.     With regard to the third required *Mathews v. Eldridge* factor, the imposition of additional procedural safeguards, such as a holding a hearing by a neutral magistrate, would not unduly burden Defendants as they presently have similar procedures in place for comparable situations. An administrative hearing containing the requested procedural safeguards would be no more cumbersome, or expensive, for Defendants to administer than Port Parole under I.N.A. § 212(d)(5) or the procedures they follow when issuing a Form I-515A - Notice to Student or Exchange Visitor.  Utilization of such procedures in this particular situation would allow an F-1 nonimmigrant student visa holder temporary admission into the United States to coordinate with their sponsors and educational institution to correct any visa-related document deficiencies and

address any negative allegations.   A hearing held within thirty (30) days of a temporary admission date would allow the student, their sponsors, and attorneys adequate time to acquire relevant supporting documents and draft responsive submissions supporting the legal basis for the requested admission to the United States.  A hearing held a short time after Port Parole, or service of a Form I-515A, would allow all parties the opportunity to prepare and deliberate without the inconvenience, stress, and time constraints of decisions made at a port-of-entry. Naturally, a pending Port Parole or Form I-515A hearing would also stay any alleged inadmissibility prior to final adjudication.

57.     A corollary waiver procedure exists in I.N.A. § 212(k) where:

> Any alien, inadmissible from the United States under paragraph (5)(A) or (7)(A)(i) of subsection (a), who is in possession of an _immigrant visa_ may, if otherwise admissible, be admitted in the discretion of the Attorney General if the Attorney General is satisfied that inadmissibility was not known to, and could not have been ascertained by the exercise of reasonable diligence by, the _immigrant_ before the time of departure of the vessel or aircraft from the last port outside the United States and outside foreign contiguous territory or, in the case of an immigrant coming from foreign contiguous territory, before the time of the immigrant's application for admission.

<em>(Emphasis added)</em>

No such waiver procedure exists in the nonimmigrant visa context other than Port Parole or the use of Form I-515A, neither of which were utilized in this case.

58.     The limited judicial inquiry requested by and through the instant Complaint asks whether Defendants provided Plaintiffs with proper notice of their allegations and whether their reasons in support of same were "facially legitimate and bona fide" to deny an F-1 nonimmigrant student visa holder admission to the United States.  In making such inquiry, Plaintiffs request that the trier-of-fact "look behind" Executive Branch discretion and balance the alleged "facially legitimate and bona fide" justifications for denied admission against the asserted constitutional

interests of Plaintiffs, as such actions burdened their constitutionally protected liberty and property rights.

### U.S. Citizens Have a Right to Promote the General Welfare

59.    "General welfare" is mentioned twice in the United States Constitution.   The first instance is contained in the Preamble, where the "People of the United States" cite promotion of the "general welfare" as one of several goals driving the establishment of the Constitution.   In *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), 22, the United States Supreme Court held that,

> (a)lthough that Preamble indicates the general purposes for which the people ordained and established the Constitution, it has never been regarded as the source of any substantive power conferred on the Government of the United States or on any of its Departments.  Such powers embrace only those expressly granted in the body of the Constitution and such as may be implied from those so granted. Although, therefore, one of the declared objects of the Constitution was to secure the blessings of liberty to all under the sovereign jurisdiction and authority of the of the United States, no power can be exerted to that end by the United States unless, apart from the Preamble, it can be found in some express delegation of power or in some power to be properly implied therefrom.

Such "express delegation of power" is found in the second mention of "general welfare" in Article I, § 8, Clause 1 of the Constitution, which has been interpreted to bestow upon Congress the power to impose and collect taxes to pay "…for the common Defense and general Welfare of the United States".  By specifically bestowing a "tax and spend" authority on Congress implies the "People of the United States" have otherwise reserved their right to promote and provide for the "general welfare" in all other areas of life.

60.    The federal government used "public interest" and promotion of "general welfare" arguments, along with powers bestowed by the Commerce Clause, to justify establishment of the United States Department of Education in 1979.   Regulation of education, and the F-1

nonimmigrant student visa and STEM OPT programs that originate therefrom, is clearly in the "public interest" and promotes the "general welfare" of the United States.

### The F-1 Visa and STEM OPT Programs Promote the General Welfare

### Through Public-Private Partnerships

61.     In *Washington Alliance of Technology Workers v. United States Department of Homeland Security, et al.*, before the United States District Court for the District of Columbia, DHS put forward their position that the I.N.A.,

> …affects basically foreign policy, constitutional guarantees, public welfare, the health, the economy, and the productivity of the Nation…
> *- Reply in Support of the Motion to Dismiss,*
> *dated September 16, 2016 at Page 30*

DHS regulations created the STEM OPT program at issue in the *Wash Tech* litigation.  The STEM OPT program allows F-1 nonimmigrant students to remain in the United States after finishing their degree to work in the public sector for designated time periods. See *Washington Alliance of Technology Workers v. United States Department of Homeland Security, et al.*, 857 F.3d 907, 909–10 (D.C. Cir. 2017).  At its core, the STEM OPT program requires a partnership between public entities and private entities/individuals in order to function.

62.     The federal government recognizes the F-1 nonimmigrant student visa and STEM OPT programs operate in the "public interest," promoting both the "general" and the "public welfare." The Department of State and DHS promote public and private participation in the F-1 nonimmigrant student visa and STEM OPT programs.  Congress specifically structured student visa statutes to require a partnership between public entities and private entities/individuals.

63.     Private entities and individuals are enticed by government agencies to serve as sources of tuition loans, grants, scholarships, and sponsorships for F-1 visa recipients.  Said private entities

and individuals pledge time, money, and other resources to participate in the F-1 visa and STEM OPT programs and, as a consequence, promote the "general welfare" equally with federal government partners.  Therefore, the right of private entities and individuals to promote and provide for the "general welfare" through participation in the F-1 nonimmigrant student visa program is a right that has been preserved by the "People of the United States."  Plaintiffs' promotion of the "general welfare" through participation in the F-1 nonimmigrant student visa and STEM OPT programs is a protected right, and not a privilege or entitlement.

### The Minimum Requirements of Procedural Due Process

64.    Longstanding case law supports judicial flexibility in determining what due process requirements are necessary to conform to the demands of particular situations.  In *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 367 U.S. 895 (1961), the United States Supreme Court held that,

> (c)onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved, as well as the private interest that has been affected by the government action.

65.    The United States Supreme Court held in *Morrissey v. Brewer*, 408 U.S. 471 (1972) at 489, that due process requires procedures that meet certain "minimum requirements." Among those "minimum requirements" are: 1) the right to notice of the proposed government action and the grounds asserted for same; 2) the right to review opposing evidence; 3) the opportunity to be heard in person by a "neutral and detached" tribunal; 4) the right to present witnesses and documentary evidence in one's favor; 5) the right to cross-examine adverse witnesses; 6) the requirement that a record of the evidence presented be prepared; and 7) the requirement that the tribunal prepare written findings of fact and reasons for its decision.

66.     The right of private entities and individuals to promote and provide for the "general welfare," through F-1 visa program sponsorship and partnership with the federal government, is absolute until due process produces a finding citing legitimate reasons to take the right away. Government action that denies such "minimum requirements" of due process to private entities and individuals is unconstitutional.

## Defendants' Actions Could Be Reviewable As Civil Rights Violations

67.     Plaintiffs assert that Defendants willfully, forcefully, and while acting under color of law: 1) intimidated their student designee because of her national origin and limited English language comprehension skills; 2) ignored and/or concealed SEVIS information that would have allowed her admission into United States to continue her studies; 3) destroyed Forms I-20 and I-94 and omitted relevant evidence from the record; and 4) charged under an unsuitable code section [I.N.A. § 212(a)(7)(A)(i)(I)] creating a non-reviewable event which deprived Plaintiffs of their constitutional rights without due process.  Based on the aforementioned, Defendants' actions could be seen as depriving Plaintiffs and student designee of their rights pursuant to 18 U.S.C. § 242 and interfering with their participation in the F-1 student visa program in violation of 18 U.S.C. § 245.

## Student Designee Never Abandoned Student Status

68.     Plaintiffs' student designee suffered two (2) profound family tragedies that required short leaves of absence from her college studies.  The nature and circumstances of such absences show that student designee did not relinquish, terminate, or give up with the intent of never again resuming her studies.   Tragic circumstances were "thrust upon her" and, as such, she could not

have acted "affirmatively to terminate or to abandon" her course of study.  *Lee v. Mukasey*, 527 F. 3d 1103, 1107 (Court of Appeals, 10th Cir. 2008).

## 28 U.S.C. § 1361 - Mandamus Actions

69.     Furthermore, 28 U.S.C. § 1361 allows mandamus actions to compel an officer of the United States to perform their duty.  In such cases,

> (t)he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

## Judicial Review Pursuant to 5 U.S.C. § 706 - Administrative Procedures Act

70.     Finally, 5 U.S.C. § 706 defines judicial scope to review violations of the Administrative Procedures Act:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall –
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> (B) contrary to constitutional right, power, privilege, or immunity;
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>> (D) without observance of procedure required by law;
>> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## STATEMENT OF FACTS

71.     Erika Contreras Cruz (referred to herein alternatively as "Contreras" or "student designee") was born in the Federal Republic of Mexico on January 9, 1979 and is a Mexican citizen.  Contreras is the only daughter amongst nine (9) siblings born to Mexican citizen parents.  She maintains her permanent residence, and is presently located, in Mexico.

72.     Contreras holds a bachelor's degree in accounting from the Autonomous University of Coahuila, has more than eight (8) years of combined accounting experience with "Masitas" A.C. (CNA) Fco. I Madero and Comercializadora de Insumos Agropecuarios S.A. de C.V. Torreon, and for three (3) years was an elite team supervisor for B-connect, a Telmex call center in Gómez Palacio, Mexico. **See copy of Contreras' resume attached hereto as Exhibit "A."**  In addition, at all relevant times herein Contreras administered commercial farm properties in Gómez Palacio owned by her and family members.  Said properties produce maize and sorghum for sale primarily as commercial livestock feed.

73.     With the goals of improving her English language skills, sharpening her business acumen, and learning computer science, Contreras investigated enrolling at a United States college through the F-1 nonimmigrant student visa program.  All prospective F-1 student visa applicants must apply to an educational institution in the United States and receive a Certificate of Eligibility for Nonimmigrant Student Status for Academic and Language Students (referred to as "Form I-20") prior to attending a student visa interview.  Contreras applied to Atlantic Cape Community College (hereinafter referred to as "ACCC"), a public community college located in

Mays Landing, New Jersey, to pursue a full-time course of undergraduate study towards an associate's degree.  On April 18, 2012, ACCC sent correspondence accepting Contreras to the college as an international student for the Fall 2012 semester. **See copy of ACCC acceptance letter attached hereto as Exhibit "B."**

74.     Upon information and belief, ACCC participates in ICE's Student and Exchange Visitor Program (hereinafter referred to as "SEVP") and has an international office that manages the college's participation in the SEVP.  All participating SEVP colleges and universities appoint dedicated employees to assist and oversee student visa applicants and holders.  Said USCIS approved employees are known as Designated School Officials (hereinafter individually referred to as a "DSO").  All ACCC DSOs work in their international office.

75.     DSOs are required to update student records on ICE's web-based platform, known as the Student and Exchange Visitor Information System (hereinafter referred to as "SEVIS"), that maintains detailed information on the status of nonimmigrant students.  ACCC DSOs request and manage all changes to SEVIS records and issue Forms I-20 to ACCC's international students. International students cannot make any change to SEVIS without direct DSO involvement. Students who experience any change in their educational plan, such as an emergency leave of absence, have an obligation to communicate such changes to the ACCC international office.

76.     According to SEVIS records, ACCC created an initial Form I-20 record for Contreras on April 20, 2012. **See copy of SEVIS Fingerprint Identification ID and Eligibility Event History for Contreras attached hereto as Exhibit "C."**

77.     Upon information and belief, all United States colleges and universities require international students to find, or be paired with, sponsors to participate in student visa programs.

Accordingly, Contreras was required to find a sponsor family in the United States and provide ACCC with their contact information.

78.     A cousin put Contreras in contact with Plaintiff Fife and his wife, Dorcas.  Plaintiff Fife is an independent financial advisor associated with L.O. Thomas & Co. in Linwood, New Jersey. After communicating several times to acquaint themselves, Contreras and Plaintiff Fife discussed possible F-1 nonimmigrant student visa sponsorship and occupational job training under DHS' STEM OPT program after Contreras completed a bachelor's degree in the United States.  Seeing an opportunity to expand financial services to the Spanish-speaking community in the future, Plaintiff Fife eventually agreed to act as Contreras's F-1 nonimmigrant visa sponsor.

79.     Plaintiff Fife executed ACCC's standard Sponsorship Agreement Form for International Students, which memorialized his required financial obligation to Contreras' education. Pursuant to the terms of said sponsorship agreement, Plaintiff Fife accepted partial responsibility for Contreras' tuition and fees, housing, transportation, personal needs, and welfare throughout the period of her ACCC studies. **See April 12, 2012 ACCC Sponsorship Agreement Form for International Students attached hereto as Exhibit "D."**  ACCC further documented Contreras' and Plaintiff Fife's individual obligations by uploading their financial information to SEVIS. **See pages 2 and 3 of Contreras' SEVIS' Student Information attached hereto as Exhibit "E."**

80.     Because F-1 student visa holders are generally restricted employment while in the United States, Contreras relied on her personal/family financial resources, a Plaintiff Foundation scholarship, and Plaintiff Fife's sponsorship to help cover her college tuition, expenses, and room and board.  Plaintiff Foundation's scholarship guidelines also restricted Contreras' employment and required her to maintain a satisfactory grade point average in order to continue

receiving her scholarship. **See copy of Contreras' Foundation scholarship award letter, dated April 11, 2012, attached hereto as Exhibit "F."**

81.     Pursuant to ACCC's Confidential Financial Statement for International Students, $4,000 of Contreras' first year college costs would be paid from her personal funds, $8,000 would be paid by Contreras' family funds, and the remaining $10,000 would be paid by scholarships or sponsors. **See copy of ACCC Confidential Financial Statement for International Students, dated April 12, 2012, attached hereto as Exhibit "G."** Of the remaining $10,000, Plaintiff Foundation contributed $3,500 and Plaintiff Fife contributed $6,500. A completed Confidential Financial Statement for International Students was required by ACCC prior to issuing Form I-20.

82.     On April 24, 2012 Contreras signed her initial Form I-20. **See copy of Form I-20 attached hereto as Exhibit "H."** Said Form I-20 clearly shows Contreras' ACCC tuition, fees, books, supplies, and living expenses totaled approximately $22,000 for the 2012-2013 academic year.

83.     The "Remarks" section of the initial Form I-20 notes that payment was made in-full for the first academic year and that Contreras would "reside with host family at no cost." **See again Exhibit "H."** In compliance with same, Plaintiff Fife was required to execute ACCC Sponsor's Affidavit of Free Room and Board before a notary on April 12, 2012. **See copy of ACCC Sponsor's Affidavit of Free Room and Board attached hereto as Exhibit "I."** The Affidavit contains a sworn promise that Plaintiff Fife would not require Contreras to perform any type of service in exchange for sponsorship. **See again Exhibit "I."**

84.     Contreras' initial Form I-20 shows her ACCC major as Code 52.9999 (Business, Management, Marketing, and Related Support Services). **See again Exhibit "H."** Due to

Contreras' limited English language proficiency, ACCC added English as a Second Language (hereinafter referred to as "ESL") classes as prerequisites to her associate's degree courses.

85.     On July 19, 2012, the United States Consulate in Monterrey, Mexico, issued Contreras an F-1 nonimmigrant student visa.  On August 9, 2012, Contreras was inspected by CBP at the Del Rio, Texas, port-of-entry and admitted to the United States as a valid F-1 nonimmigrant student. **See Form I-20 (# N0009170337) stamped on August 9, 2012 attached hereto as Exhibit "J."**

86.     Contreras entered and exited the United States to study at ACCC without incident for four (4) years. **See copies of Contreras' ACCC student identification cards attached hereto as Exhibit "K."**  All of her arrivals and departures were entered on DHS's Arrival and Departure Information System (hereinafter referred to as "ADIS"). **See again Exhibit "C."**

87.     After successfully completing two (2) years of required ESL classes, Contreras was formally admitted to ACCC's two (2) year associate degree program.  Contreras was on her way to complete her fifth, of five (5), semesters counting towards her associate's degree when she was denied reentry by Houston CBP. **See copy of Contreras' 2012 to 2017 ACCC transcript attached hereto as Exhibit "L."**  After completing the ESL prerequisites**,** Contreras made the Dean's List every semester with exception of the semester she made President's List. **See copies of ACCC Dean's List certificates attached hereto as Exhibit "M."**

88.     On April 22, 2016 Felipe Contreras Cruz, one of Contreras' brothers, was walking his child to school in Gómez Palacio, Mexico, when he was run over by a motorcycle.

89.     Upon hearing of her brother's serious injuries, Contreras immediately contacted ACCC's international office and received approval from a DSO for an emergency leave of absence from her studies.  Pursuant to the conditions of her emergency leave, Contreras agreed to take her ACCC Spring 2016 semester final exams upon her return to the United States.  On April 23,

2016 Contreras flew to Mexico be by her brother's side. **See copy of Contreras' travel itinerary attached hereto as Exhibit "N."**

90. Tragically, Felipe died on April 24, 2016 from cranioencephalic trauma, a fractured skull, and hemorrhaging cerebral lacerations. **See copy of Felipe's death certificate attached hereto as Exhibit "O."**

91. Contreras' eldest brother, Hipolito Contreras Cruz, hired an attorney to investigate allegations the motorcyclist made to police in order to avoid paying Felipe's hospital bills. Upon information and belief, the motorcyclist was connected to a Gómez Palacio drug cartel.

92. Pursuant to 8 C.F.R. § 214.1(b)(1), F-1 nonimmigrant student visa holders can automatically revalidate an expired visa when returning to the United States from an absence of less than thirty (30) days to a contiguous territory provided they are in possession of a valid passport, a Form I-94 issued in connection with a previous admission, and a valid Form I-20. Upon information and belief, Mexico is a territory contiguous to the United States.

93. After just twenty (20) days in Mexico, Contreras was granted reentry to the United States and returned to her ACCC studies on May 12, 2016. **See copy of May 12, 2016 Form I-94 Arrival/Departure Record attached hereto as Exhibit "P."** Upon information and belief, Contreras' F-1 nonimmigrant student visa, control number 20122001450024 with an expiration date of May 22, 2015, was automatically revalidated pursuant to 8 C.F.R. § 214.1(b)(1). **See copies of Contreras' F-1 visa and expired Mexican passport (# G07163202) attached hereto as Exhibit "Q" and valid Mexican passport (# G15099955) attached hereto as Exhibit "R."**

94. On June 22, 2016 Hipolito Contreras Cruz went missing from his home in Gómez Palacio under mysterious circumstances.

95.     Six (6) days later a cadaver was found in a field just outside Gómez Palacio and reported to police.  Crime scene investigators determined the cadaver was that of a male who had been asphyxiated with a ligature and later burned by perpetrators in an attempt to conceal the victim's identity.

96.     Upon hearing the news, and fearing the worst, Contreras' family gave DNA samples to the State of Durango Medical Examiner's Office for comparison with those taken from the unidentified body.  Unfortunately, DNA test results soon confirmed the partially cremated cadaver was Hipolito's. **See State of Durango death certificate attached hereto as Exhibit "S."**

97.     On August 3, 2016 an ACCC DSO reissued Contreras' Form I-20 with a revised program end date of May 19, 2017. **See copy of reissued Form I-20 (# N0009170337) attached hereto as Exhibit "T."**  The DSO noted in the Form I-120 "Remarks" section that, at that point in time, Contreras still needed two (2) semesters to complete her associate's degree requirements. Naturally, Contreras wished to attend her brother's funeral and help sort out, what had become, an increasingly chaotic family situation in Mexico.  That same day, an ACCC DSO granted Contreras' request for a second emergency leave of absence from her studies.

98.     Fearing additional violence or reprisals, members of Contreras' family sought refuge in Ciudad Acuña, Mexico.  Ciudad Acuña is located approximately eight (8) hours away from the family's hometown of Gómez Palacio.

99.     On August 26, 2016 Contreras flew to Texas. **See copy of Contreras' travel itinerary attached hereto as Exhibit "U."**  On August 28, 2016 Contreras crossed the border at the Del Rio, Texas, port-of-entry due to its proximity to Ciudad Acuña. **See again Exhibit "P."**

100.    Unbeknownst to Contreras, on September 12, 2016 an ACCC DSO entered Contreras'
leave of absence on SEVIS as an "Authorized Early Withdrawal."  The DSO noted Contreras,
"needed to unexpectedly leave the U.S. to address emergency family issues.  Will try to return
for the Spring 2017 semester." **See copy of SEVIS Event History attached hereto as Exhibit
"V."**  That same day SEVIS changed Contreras' student status from "Active" to "Terminated."
Upon information and belief, ACCC considered Contreras' Fall 2016 semester a "zero semester"
and not a permanent withdrawal from her studies.

101.    Also unbeknownst to Contreras, her name was flagged on DHS's Treasury Enforcement
Communications System (hereinafter referred to as "TECS").  TECS is a computer application
that allows CBP officers, and other federal agents, access to numerous operational records and
databases relevant to antiterrorism and law enforcement.  In a remarks section, dated September
14, 2016, CBP noted:

> For POE only: SEVIS ID# N0009170337 is no longer valid.  Do not allow entry
> as F1, F2, M1, M2, J1, or J2 if I-20/DS-2019 has this SEVIS ID without verifying
> status in SEVIS.  If subject is out of status, take appropriate action.  This flag does
> not apply to entry with a different SEVIS ID or other classes of admission.  Do
> not use as the sole means for refusing admission or benefit.  If this SEVIS ID is
> valid, report disposition to ICE SEVP [redacted pursuant to (b)(6), (b)(7)(c)].
> **See TECS Person Query attached hereto as Exhibit "W."**

102.    On September 21, 2016, just twenty-five (25) days after leaving the United States on
authorized emergency leave, Contreras sought readmission through the Del Rio, Texas, port-of-
entry. **See second page of January 3, 2017 Form I-94 Arrival/Departure Record attached
hereto as Exhibit "X."**  Upon information and belief, CBP inspected Contreras and, once again,
allowed her admission pursuant to the 8 C.F.R. 214.1(b)(1) automatic visa revalidation
procedure.

103.    On November 28, 2016 Contreras registered for her Spring 2017 ACCC courses. **See ACCC Registration/Course Change Form attached hereto as Exhibit "Y."**

104.    Unfortunately, Contreras' family turmoil continued.  On December 1, 2016 Contreras flew to Texas and, once again, crossed the border into Mexico through the Del Rio port-of-entry. **See copy of Contreras' travel itinerary attached hereto as Exhibit "Z."**

105.    Twenty-six (26) days later, on December 27, 2016, Contreras sought admission into the United States at the Del Rio, Texas, port-of-entry.  Contreras was scheduled to begin ACCC's Spring 2017 semester the second week of January 2017.  CBP officers initially refused Contreras reentry because SEVIS showed her student status as "Terminated." **See Del Rio Form I-213 Record of Deportable/Inadmissible Alien attached hereto as Exhibit "AA." and Form I-275 Withdrawal of Application for Admission attached hereto as Exhibit "AB."**

106.    Upon information and belief, Del Rio CBP allowed Contreras to telephone ACCC's international student office to inquire regarding her student status.  That same day an ACCC DSO submitted a correction request to SEVIS requesting that Contreras be returned to "Active" student status. **See again Exhibits "C" and "V."**  Unbeknownst to Contreras, later that day a DHS officer also updated SEVIS to show Contreras' student status as "Pending." **See again Exhibit "V."**

107.    Del Rio CBP clearly noted on Forms I-213 and I-275, both dated December 27, 2016, that their actions were based on Contreras withdrawing her application for admission. Furthermore, Del Rio CBP indicated:

> This adverse action is an inadvertent withdrawal case for documentary deficiency only and does not merit cancelling or voiding subject's BCC/Visa on subsequent travels if subject has overcome the documentary deficiency.
> **See again Exhibits "AA" and "AB."**

Upon information and belief, CBP officers told Contreras to return to the Del Rio port-of-entry a few days later to inquire if SEVIS had updated her student status.

108.    On January 3, 2017 Del Rio CBP noted Contreras' "Pending" student status correction request in the SEVIS system and, once again, allowed her to reenter the United States via the 8 C.F.R. § 214.1(b)(1) automatic F-1 nonimmigrant student visa revalidation process. **See again second page of Exhibit "X."**  Upon information and belief, Contreras did not know her SEVIS student status was listed as "Pending" and not "Active."

109.    Unbeknownst to Contreras, on January 4, 2017 the ACCC international office received an e-mail from the SEVIS Help Desk asking for corroborating documentation to continue processing the pending SEVIS status correction. **See copy of ACCC DSO e-mail, dated January 5, 2017, attached hereto as Exhibit "AC."**

110.    On January 6, 2017 Contreras flew to Philadelphia, Pennsylvania, to start ACCC's Spring 2017 semester. **See copy of Contreras' travel itinerary attached hereto as Exhibit "AD."**

111.    On January 19, 2017 an ACCC DSO submitted written correspondence in response to the SEVIS Help Desk request for documentation explaining Contreras' family emergency leave and her return for ACCC's Spring 2017 semester. **See copy of January 19, 2017 ACCC DSO correspondence to SEVIS attached hereto as Exhibit "AE."**  The DSO's response explicitly mentioned that Contreras was permitted reentry to the United States in January of 2017 and concluded by requesting that SEVIS change Contreras' status from "Terminated" to "Active." **See again Exhibit "AE."**

112.    Later that day the SEVIS Help Desk e-mailed notice to the ACCC DSO that SEVP had approved the correction to Contreras' SEVIS record and student status.  The DSO forwarded the SEVIS Help Desk e-mail to another ACCC DSO as evidence that Contreras' associate's degree

end date could be extended. **See copy of ACCC DSO e-mail, dated January 19, 2017, attached hereto as Exhibit "AF."**

113.    On January 19, 2017 an unknown DHS officer, pursuant to I.N.A. § 214.2(f)(16)(i) and under authority of the District Director, updated Contreras' SEVIS status to "Active" and annotated her Student Status Change Date accordingly. **See again Exhibits "C" and "E."**

114.    On February 17, 2017 an ACCC DSO reissued Contreras' Form I-20 (# N0009170337) and extended her associate's degree program end date until December 22, 2017.  The "Remarks" section noted that Contreras had "needed to unexpectedly leave the U.S. to address emergency family issues" and would "try to return for the Spring 2017 semester." **See copy of reissued Form I-20 (# N0009170337), dated February 17, 2017, attached hereto as Exhibit "AG."**

115.    Upon information and belief, Contreras attended and successfully completed her ACCC Spring 2017 semester coursework. **See again Exhibit "L."**

116.    At the conclusion of the Spring 2017 semester, Contreras made plans to return to Mexico during ACCC's regularly scheduled summer break.  She few to Monterrey, Mexico, on July 2, 2017. **See copy of Contreras' travel itinerary attached hereto as Exhibit "AH".**  As can be expected of a student intending to return for the Fall 2017 semester, her travel itinerary shows she purchased round-trip tickets. **See again Exhibit "AH."**

117.    Pursuant to Contreras' itinerary, on July 29, 2017 she flew from Mexico to Houston, Texas.  Shortly after presenting herself for inspection at the George Bush Intercontinental Airport, Contreras was detained by Houston CBP officers and questioned for many hours.

118.    CBP produced a Record of Sworn Statement in Proceedings, under I.N.A. § 235(b)(1), on Forms I-867A, I-831, and I-867B (hereinafter collectively referred to as the "Houston

Statement"). **See copy of the Houston Statement, dated July 30, 2017, attached hereto as Exhibit "AI".**

119.     Upon information and belief, when an F-1 nonimmigrant student visa holder's documentation is considered incomplete or unsatisfactory by CBP at the port-of-entry, the alien is given an opportunity to contact her college's international office for DSO assistance in obtaining clarification or copies of corrected documentation.  Said procedure had been followed by Del Rio CBP on December 27, 2016. **See again Exhibit "V."**

120.     Upon information and belief, Houston CBP did not allow Contreras an opportunity to contact ACCC's international student office on July 29 or 30, 2017. **See again Exhibit "AI."**

121.     Upon information and belief, Houston CBP did not issue Contreras a Form I-515A - Notice to Student or Exchange Visitor or admit her via Port Parole pursuant to I.N.A. § 212(d)(5).

122.     In order to maintain valid F-1 nonimmigrant visa status international students must maintain a "full course load" at their appointed educational institution, not be engaged in any employment without authorization of DHS, have an accurate SEVIS record, and not be past the program end date indicated on their Form I-20.   Upon information and belief, Contreras complied with all aforementioned conditions for valid F-1 nonimmigrant visa status when she appeared for inspection by Houston CBP on July 29, 2017.

123.     Pages 2-of-7 and 3-of-7 of the Houston Statement contain questions showing CBP officers did not understand, and did not care to investigate, the requirements and limitations of Plaintiff Fife's role as Contreras' F-1 student visa sponsor. **See again Exhibit "AI."**   CBP officers repeatedly implied that Contreras was Plaintiff Fife's employee.  The Houston Statement

shows Contreras rebuked CBP allegations and stated, in her limited English, that she was not Plaintiff Fife's employee.

124.    Page 1-of-7 of the Houston Statement contains the following question and answer:

CBP Officer:   Do you swear or affirm that all the statements that you are about to make are true and complete?

Contreras:     I'm sorry, can you repeat that last part.  Some words are still confusing to me.

**See again Exhibit "AI."**

125.    Page 2-of-7 of the Houston Statement shows Contreras' had plans to participate in a future STEM OPT training extension with Plaintiff Fife after improving her English and completing her ACCC degree:

Contreras:    … Frank said someday if I wanted to study in this country and if I want to make money or business in the future.  After school to start to help him with speaking Spanish- translating or helping them with taxes.  I thought it was interesting to study, learn here and learn English.  I thought it was important to learn English.  I completed my ten levels of ELS [sic] (2012 at Atlantic Cape Community College).  When I finished my coursed [sic], he asked me if I wanted to continue here and I said yes.  I tried to do the best but English is not easy for me…

**See again Exhibit "AI."**

126.    Page 3-of-7 of the Houston Statement contains an exchange where Contreras directly answered CBP's allegations of unlawful employment and shows Plaintiff Fife acted in conformance with all I.N.A., and ACCC, requirements and conditions for an F-1 nonimmigrant student visa sponsor:

CBP Officer:   What do you do that Frank Fife is paying your tuition?

Contreras:     I am not working.  Sometimes I help him to clean the yard, clean his home.  When he needs to run errands, he's 75 years old I take him to Philly to the hospital.

CBP Officer:   You provided a service and were compensated to provide a service.  Do you consider that work?

Contreras:     No because I am not obligated to do nothing [sic].  He don't [sic]
               always give me to pay my tuition.

**See again Exhibit "AI."**

Houston CBP officers clearly did not understand Plaintiff Fife's obligations as a sponsor or how

Contreras' ACCC tuition was paid.  Instead, CBP erroneously concluded that Contreras' tuition

was fee-for-service compensation, a muddled allegation to fit a fabricated story that Contreras

was employed as Plaintiff Fife's housekeeper.

127.    Page 6-of-7 of the Houston Statement contains questions and answers confirming

Contreras' knew the restrictions of her F-1 nonimmigrant student visa and intended to continue

studying full-time until she graduated from ACCC.  Contreras' responses are consistent with her

answers on Page 2-of-7 of the Houston Statement, where she spoke of a possible STEM OPT

training extension or future cap-accepted H-1B nonimmigrant work visa application:

CBP Officer:  What is the purpose of your trip today?

Contreras:    Go to the city where I am studying to pay for my next classes that I
              will have for my last semester.

CBP Officer:  Is Frank Fife paying for your education?

Contreras:    Yes.

CBP Officer:  Do you have any petitions pending?

Contreras:    I have a petition for a job visa but I don't.  I don't have any
              response.  Frank Fife is sponsoring my work.

CBP Officer:  What do you mean Frank Fife is sponsoring your work visa?

Contreras:    If I get the work visa, I will work for him.

**See again Exhibit "AI."**

Defendants failed to recognize that neither planning for a future STEM OPT training extension

application nor making application for an H-1B visa are indicators of "immigrant intent" under

the I.N.A.  Both are nonimmigrant visa programs, please see again 8 U.S.C. § 1101(a)(15)(H).

128.   When directly questioned regarding alleged prior employment in the United States, Contreras explained to Houston CBP that she understood she could not work with her F-1 student visa:

CBP Officer:   Do or have you ever had authorization to work in the U.S.?

Contreras:     No.

CBP Officer:   Do you know it is illegal to work without the proper authorization?

Contreras:     Yes.

**See again Exhibit "AI."**

Contreras' answers on the Houston Statement show CBP officers could have benefitted from a review of the terms and limitations contained in the ACCC Sponsorship Agreement Form for International Students, Foundation scholarship award letter, and ACCC Confidential Financial Statement for International Students. **See again Exhibits "D," "F,""G," and "I."**  Houston CBP had procedural mechanisms at hand that would have allowed them to investigate and review the aforementioned documents, and admit Contreras with issuance of a Form I-515A - Notice to Student or Exchange Visitor or via Port Parole.  Defendants knowingly failed to do so.

129.   The Houston Statement shows Contreras was a full-time college student who, as part of the cultural exchange that inherently occurs between F-1 visa students and their host families, occasionally participated in Plaintiff Fife's household activities.  The Houston Statement also shows Houston CBP officers failed to distinguish between the common courtesies of an appreciative houseguest from the types of services provided by paid employees.  Said impasse in understanding could either be attributed to Contreras' admitted English language deficiencies or the prejudices and biases of Houston CBP officers.  The obligations and employment limitations of ACCC's Sponsorship Agreements and Financial Statement, the Foundation scholarship award

letter, and Contreras' answers to Houston CBP show her understanding that she could not, and did not, work for compensation of any kind. **See again Exhibits "D,""F,""G," "I," and "AI."**

130.    Even so, on July 30, 2017 Houston CBP created a Record of Deportable/Inadmissible Alien listing Contreras' occupation as "housekeeping," her salary as "0" (zero), and the name of her employer as "Frank Fife." **See Houston Form I-213 Record of Deportable/Inadmissible Alien, dated July 30, 2019, and attached hereto as Exhibit "AJ."** Plaintiffs assert the entries on Form I-213 are erroneous and plainly incongruous to the charge of inadmissibility entered by Houston CBP on Contreras' Notice and Order of Expedited Removal. **See again Exhibit "AJ" and Forms I-860 and I-831, dated July 30, 2017, and collectively attached hereto as Exhibit "AK."** In a further inconsistency, the Order of Expedited Removal lists Contreras' Status at Entry as "Other Non-Immigrant." **See again Exhibits "AJ" and "AK."** Houston CBP simultaneously labeled Contreras a "nonimmigrant" and an "immigrant housekeeper." In doing so, Defendants knowingly stripped Plaintiffs of their liberty and property rights without due process of law.

131.    As previously noted, family living and immersion into the culture of the United States is one of the many stated goals of the F-1 nonimmigrant visa program. If Defendants regard such cultural exchanges as "fee-for-service" employment, then Plaintiffs should have been given advance notice of precisely what cultural and/or host family activities were prohibited pursuant to the I.N.A. and Defendants' internal guidelines. An explicit list of banned cultural and/or host family activities should have also been included in Defendants' distributed F-1 nonimmigrant visa program materials and posted to Defendants' internet resources. Additionally, advance notice of banned cultural and/or host family activities should have been given to Plaintiffs by DHS-appointed SEVP member educational institutions, such as on ACCC's Sponsorship

Agreement Form for International Students, the Confidential Financial Statement for International Students, and the Sponsor's Affidavit of Free Room and Board. **See again Exhibits "D," "G," and "I."**

132.    Naturally, Contreras was stunned and unprepared to deal with two (2) tragic family deaths in such a short time span.  Contreras' lack of emergency funds for last-minute airline tickets is additional evidence that she was not employed in the United States.  Common sense dictates that few full-time college students, even those with significant independent means to fund their education, have immediately available resources to pay for costly unplanned international flights.  Page 2-of-7 of the Houston Statement shows Contreras explained to Houston CBP that Plaintiff Fife altruistically lent her money for just one (1) of the emergency trips to Mexico. **See again Exhibit "AI."**  Houston CBP's allegations that Plaintiff Fife monetarily compensated Contreras when her brothers passed away are callous and nonsensical. **See again Exhibit "AJ."**  Common decency teaches that concerned friends help one another.

133.    Page 4-of-7 of the Houston Statement reveals CBP questions regarding approximately 500,000 Mexican pesos, about $25,600.00 US dollars at current exchange rates, that Contreras told them were available in personal and family funds to pay for her planned educational and personal needs.  Had Houston CBP officers chosen not to ignore Del Rio CBP's December 27, 2016 determination, that Contreras was able to "support herself with the income her properties produce in Durango, Mexico," and followed reasonable investigatory procedures they would have reviewed documents confirming Contreras' ownership of multiple properties in Mexico, and Banamex bank account deposit receipts and account statements, showing Contreras and her family had, and continue to have, the monies she claimed. **See Contreras' Gómez Palacio land parcel ownership certificate, dated March 19, 2010 and Ciudad Acuña real estate purchase**

contract, filed October 26, 2016, attached collectively hereto as Exhibit "AL;" Contreras' and family members Banamex deposit receipts and account statements attached collectively hereto as Exhibit "AM;" and Contreras' Gómez Palacio land parcel ownership certificate, dated May 25, 2017, attached hereto as Exhibit "AN." CBP officers would have also learned that several of Contreras' Gómez Palacio properties produce maize and sorghum for commercial livestock feed. See farmers irrigation association account correspondence, dated October 9, 2017, attached hereto as Exhibit "AO;" bulk maize sales receipts to purchaser, Agricola El Eden, SPR de RL de CV, for the months of July and August of 2017, attached hereto collectively as Exhibit "AP;" and correspondence from Agricola El Eden, SPR de RL de CV, dated October 9, 2017, confirming average yearly maize sales exceeding 700 metric tons attached hereto as Exhibit "AQ." The above documents support Plaintiffs' assertions that at all relevant times herein Contreras acted without immigrant intent, had the income and assets she claimed, and was an F-1 nonimmigrant student simply looking to further her college studies in the United States.

134. Contreras' answers to CBP questions, on Pages 5-of-7 and 6-of-7 of the Houston Statement, make it apparent she knew the automatic visa revalidation procedure and had no reason to believe her F-1 visa had not been revalidated when she was readmitted to the United States on January 3, 2017:

> CBP Officer: Why do you not have a valid visa?
>
> Contreras: Because my school end [sic] in December and I will go back. I plan to go back to Mexico and will not be gone for more than 30 days so I can use the same visa.
>
> **See again Exhibit "AI."**

Contreras' answers clearly show the grounds for inadmissibility alleged by CBP were not known to her, and could not have been ascertained by the exercise of reasonable diligence, before she boarded her flight to Houston:

CBP Officer: You presented F1 visa foil number F3434725 issued July 19, 2012 expiration May 22, 2015.  Is that correct?

Contreras:   Yes.  But I was not more than twenty-eight (28) days in Mexico.

**See again Exhibit "AI."**

Furthermore, ACCC had allowed Contreras to enroll and take classes right from the start of the Spring 2017 semester, giving her and Plaintiffs no notice or indication that she was not in complete conformance with F-1 nonimmigrant visa requirements:

CBP Officer: Did you attend school?

Contreras:   Yes.

CBP Officer: How many hours did you attend school?

Contreras:   Thirteen (13) credits.

CBP Officer: How many classes did you complete?

Contreras:   I took four (4) classes and completed (4) classes.

CBP Officer: Did you complete your courses for the semester?

Contreras:   Yes.

CBP Officer: Records indicate you did complete the course for the semester?

Contreras:   Yes.  I did.

CBP Officer: How did you take and complete four classes when records indicate you were terminated January 11, 2017?

Contreras:   I was enrolled in school.  I started school in [sic] 18th of January. My advisor said I was active then.  I took my classes.  I got three (3) A's and one (1) B.

**See again Exhibits "C," "E," "L," "M," "V," "X," "Y," "AE," "AF," and "AI."**

135.    Additionally, SEVP's own SEVIS Help Desk staff reactivated Contreras' status to "Active" to coincide with the beginning of ACCC's Spring 2017 semester.  Contreras' updated Form I-20 even used the same number as her prior Forms I-20 (# N0009170337), however the program end date was extended to December 22, 2017 to account for her emergency leaves of absence. **See again Exhibits "C," "E,""H,""J," "Q," "L," "T," "AC," "AE," "AF," and "AG."**  Upon information and belief, Contreras understood that as long as a leave of absence outside of the United States was not for more than thirty (30) days, even expired Form I-20's could be revalidated pursuant to 8 C.F.R. § 214.1(b)(1).

136.    On Pages 3-of-7 and 6-of-7 of the Houston Statement Contreras explained, in general terms, to CBP officers that she wanted to continue at ACCC while simultaneously taking classes at Thomas Edison State University under the terms of a partnership agreement between those institutions. **See copy of Thomas Edison State University press release, dated December 22, 2016, attached hereto as Exhibit "AR."**  Had Contreras been given the opportunity to participate in the joint ACCC/Thomas Edison State University courses, she could have completed bachelor's degrees in both business accounting and computer science.  As Contreras stated to Houston CBP, the planned joint bachelor's degrees would have qualified her to seek an STEM OPT extension after graduation:

> CBP Officer:   Earlier you stated, "After school to start to help him with speaking Spanish-translating or helping them with taxes." Explain.
>
> Contreras:   I mean, which I said that when I complete my degree, not each day [sic] my plan is to complete [sic] work visa and do what is related to [sic] accounting career.  After we finish Bachelor, we can apply for one (1) year, job practice.
>
> **See again Exhibit "AI."**

137.    Upon information and belief, it was only under the conditions of an approved STEM OPT program that Contreras hoped to seek future employment training.  Working towards that

goal, Contreras enrolled in the joint ACCC/Thomas Edison State University courses. **See copies of Contreras' Thomas Edison State University Out-Of State Tuition registration and IRS Form 1098-T for tax year 2017 attached hereto as Exhibit "AS."** The above documents show Contreras' unwavering desire to continue studying in the United States and negate Houston CBP's allegations of unauthorized employment and immigrant intent listed on Form I-275 – Withdrawal of Application for Admission. **See copy of Form I-275, dated July 30, 2017 attached hereto as Exhibit "AT."**

138.    Plaintiffs contend Contreras' answer on Page 6-of-7 of the Houston Statement, regarding whether Plaintiff Fife "pays" for her education, is the literal truth.  Houston CBP's investigatory procedures failed to discover and clarify, even when the evidence was available to them on SEVIS, that Plaintiff Fife was required to pay for Contreras' tuition as guarantor, under the terms of ACCC's international student sponsorship agreements, and as trustee of the Foundation scholarship. **See again Exhibits "D," "E," "F," "G," "I," and "J."** Said agreements obligated Plaintiff Fife to ensure that Contreras' tuition was paid, but he was to receive nothing in return.

139.    As previously noted, Plaintiff Foundation was formed in 2004 and received 26 U.S.C. § 501(c)(3) exemption status on June 10, 2005. **See copy of IRS 1076 letter, dated July 6, 2005, attached hereto as Exhibit "AU."** Foundation scholarship funds are contained in an annuity and are not Plaintiff Fife's property. **See copy of PennMutual Guaranteed Foundation Fixed Annuity annual statement, dated 01/20/2018 to January 19, 2019, attached hereto as Exhibit "AV."** Over the last thirteen (13) years Plaintiff Foundation has awarded dozens of scholarships and donated to numerous charitable causes. **See copy of correspondence from Reilly Matthews Bononcini, CPAs, P.A., dated May 20, 2018, attached hereto as Exhibit "AW."**

140.   During the interrogation Houston CBP evaluated and documented Contreras' detainee safety and at-risk indicators.  Upon information and belief, when asked if she "self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming" Contreras answered, "Yes."  Even so, Houston CBP documented a "No" response. **See Detainee Assessment, dated July 31, 2017, attached hereto as Exhibit "AX."**  Such oversight is consistent with Defendants' creation of an interrogation narrative convenient to their finding of inadmissibility.

141.   Plaintiffs complain that Houston CBP officers, despite having exculpatory information and procedural tools available to allow more time for review, intimidated Contreras and curtailed her answers in order to create a record fitting the "employee housekeeper" narrative they developed to deny her admission.  SEVIS records, printed by Defendants on July 30, 2017, show Houston CBP officers knew Contreras had no criminal record and, more importantly, that her "Active" student status was listed as "Approved" on January 19, 2017. **See copies of SEVIS Print Rapsheet Screen, dated July 30, 2017, attached hereto as Exhibit "AY" and SEVIS Correction Request by Student, dated July 30, 2017, attached hereto as Exhibit "AZ."** Despite being coerced and misinterpreted by Houston CBP due to her English language deficiencies, Plaintiffs assert Contreras' answers in the Houston Statement were truthful and show her behavior in the United States complied with all F-1 nonimmigrant student visa requirements. **See again Exhibit "AI."**

142.   After a cursory investigation, Houston CBP issued a Form I-860 Determination of Inadmissibility under I.N.A. § 212(a)(7)(A)(i)(I), a charge conveniently fitting their fabricated "employee housekeeper" narrative. **See again Exhibit "AK."**

143.   Regretfully, Contreras was ordered removed and was imposed a five (5) year bar to reentry as an "intending immigrant" even though all available proofs suggested otherwise. **See**

copy of Form I-296 Notice to Alien Ordered Removed/Departure Verification, dated July 30, 2019, attached hereto as Exhibit "BA."

144.    Houston CBP stamped "CANCELLED" five (5) times across Contreras' passport containing F-1 visa (#20122001450024), a document revalidated numerous times since 2012 without issue. **See copy of cancelled F-1 student visa attached hereto as Exhibit "BB."** Fortunately, Del Rio CBP's January 3, 2017 entry stamp, showing Contreras was admitted to the United States in F-1 status for the duration of her stay ("D/S"), is still clearly visible on Contreras' passport. **See again Exhibit "BB."**

145.    Upon information and belief, on January 3, 2017 Del Rio CBP removed Contreras' original Form I-94 from her passport and provided her with a replacement Form I-94 documenting her valid readmission to the United States. **See again Exhibits "Q," "R," and "X."** Upon information and belief, during the July 29 and 30, 2017 Houston interrogations a CBP officer confiscated and destroyed Form I-94 (#20242749185), dated January 3, 2017 and issued to Contreras by Del Rio CBP. Said Form I-94 (#20242749185) was documentary proof of Contreras' prior visa revalidation and valid readmission to the United States on January 3, 2017.

146.    Accordingly, on March 7, 2018 Plaintiffs filed a Form G-639 Freedom of Information Act Request requesting a copy of Contreras' entire alien file, including copies of all Forms I-94 and I-20. **See copies of e-mail to USCIS and Forms G-28 and G-639 attached hereto as Exhibit "BC."**

147.    Regretfully, both FOIA responses to Plaintiffs' counsel, dated August 13, 2018 and October 29, 2018 respectively, failed to contain any copies of the requested Forms I-94 and I-20.

148.    Fortuitously, on May 22, 2018 Counsel for Plaintiffs printed Contreras' January 3, 2017 Form I-94, and detailed entry and exit information, from CBP's Form I-94 locator website. **See**

**again Exhibit "X."** Said document proves Contreras' F-1 visa was revalidated and that she was lawfully admitted to the United States on January 3, 2017. **See again Exhibit "BB."** Upon information and belief, Contreras' detailed entry and exit information is no longer publicly available on CBP's Form I-94 locator website.

149.    Even so, Houston CBP officers chose to disregard Del Rio CBP's Form I-94 (#20242749185) as proof of Contreras' prior visa revalidation and valid readmission to the United States on January 3, 2017.  They also disregarded Contreras' "Active" SEVIS status and completed ACCC Spring 2017 coursework.  Instead, Houston CBP followed a biased "employee housekeeper" narrative fabricated to ensure maximum punitive consequences to both Contreras and Plaintiffs.  Plaintiffs argue Defendants cannot retroactively impute nonconforming and unlawful behavior to Contreras and/or Plaintiffs prior to her January 19, 2017 visa reinstatement by SEVP's District Director.  Logic and fairness dictate no other result.

150.    Assuming, arguendo, that Del Rio CBP had mistakenly admitted Contreras on January 3, 2017, no rational public safety or national security goals are advanced by Houston CBP classifying Contreras as an inadmissible "intending immigrant" and imposing a five (5) year reentry ban.  At most, Houston CBP should have processed Contreras as an innocuous withdrawn entry.

151.    Even if Houston CBP had concerns regarding the validity of Contreras' SEVIS status or ACCC enrollment, they should have still admitted her via Port Parole under I.N.A. § 212(d)(5) or after issuing a Form I-515A - Notice to Student or Exchange Visitor.  Furthermore, Defendants had due process obligations to provide Plaintiffs with a hearing, held perhaps thirty (30) days after the student designee's temporary admission date, to review the alleged grounds for inadmissibility.  Such a process would have allowed Plaintiffs to meet with their student

designee and counsel, acquire relevant supporting documents, and draft responsive submissions supporting the legal basis for the requested admission.  A hearing, held a short time after Port Parole or service of Form I-515A, would have allowed Plaintiffs and Defendants opportunity to prepare and deliberate without the inconvenience, stress, and time restraints of hasty decisions made at a port-of-entry.

152.    Seeking to correct the record, lift the five (5) year entry ban imposed on Contreras by Houston CBP, and find a legal means for her to reenter the United States as an F-1 Visa nonimmigrant student to complete her studies, on February 28, 2018 counsel herein submitted a letter brief to the Attorney General of the United States and CBP offices located in both Del Rio and Houston, Texas.

153.    On March 26, 2018 the Houston CBP Field Office Director responded to counsel's letter brief. **See copy of CBP correspondence, dated March 26, 2018, attached hereto as Exhibit "BD."**  The correspondence instructed Contreras to "seek permission from the Department of Homeland Security if she wishes to enter (the United States) prior to the expiration date of the expedited order" and goes on to indicate that "application forms to apply for requesting such permission may be obtained by contacting the United States Consulate."

154.    Shortly thereafter, on April 4, 2018, the Laredo CBP Field Office Director, separate and apart from Houston CBP, also responded to the letter brief. **See copy of CBP correspondence, dated March 26, 2019, attached hereto as Exhibit "BE."**  The correspondence states that Contreras "has not been barred indefinitely from applying for admission into the United States, but she must apply to a U.S. Embassy or Consulate to obtain a nonimmigrant visa to reenter."

155.    On May 17, 2018 the Nuevo Laredo Consulate answered an e-mail inquiry from Plaintiffs' counsel with instructions to contact "Consulates with USCIS offices."   After

following the website link provided, it was determined that the United States Consulate with a USCIS office most convenient to Contreras was in Monterrey, Mexico. **See copy of Nuevo Laredo Consulate e-mail, dated May 17, 2018, attached hereto as Exhibit "BF."**

156.    Eager to start the process, Contreras scheduled an Info-Pass appointment with the Monterrey USCIS office for June 19, 2018.  At that appointment a USCIS officer informed Contreras was that she could not file a permission form, such as the Form I-192 - Application for Advance Permission to Enter as a Nonimmigrant mentioned in the March 26, 2018 Houston CBP Field Office response, unless she had obtained a new nonimmigrant visa.  Contreras was also instructed to contact the appropriate United States Embassy or Consulate regarding her eligibility for an inadmissibility waiver in connection with a new F-1 student nonimmigrant visa application.

157.    Following the procedure outlined by the Monterrey USCIS office, Contreras enrolled for ACCC's Fall 2018 semester.   Once again, Plaintiff Foundation awarded her a $2,500.00 scholarship and ACCC required Plaintiff Fife to sign another Sponsor's Affidavit of Free Room and Board. **See copy of deposited Foundation scholarship check, dated May 10, 2018, attached hereto as Exhibit "BG" and copy of ACCC Sponsor's Affidavit of Free Room and Board, dated April 27, 2018, attached hereto as Exhibit "BH."**

158.    On May 16, 2018 ACCC sent Contreras reenrollment confirmation and issued her a new Form I-20. **See copies of ACCC correspondence, dated May 16, 2018, attached hereto as Exhibit "BI" and Form I-20 (#N0029545193) attached hereto as Exhibit "BJ."**

159.    On July 16, 2018 Contreras appeared for a new F-1 nonimmigrant student visa interview at the United States Consulate in Monterrey, Mexico. **See copy of consular appointment confirmation and instructions attached collectively hereto as Exhibit "BK."**

160.    Upon information and belief, the Consulate's visa officer did not ask Contreras any questions or review the content of the new F-1 nonimmigrant student visa application with her. Instead, Contreras was sent away with a preprinted visa denial form, dated November 2017, and without recourse to continue her studies. **See copy of United States Consulate - Monterrey denial form, dated November 2017, attached hereto as Exhibit "BL."**

## CLAIMS FOR RELIEF

## COUNT I

### Judicial Review of F-1 Student Visa Denial – Violation of Liberty Interests

161.    Plaintiffs incorporate by reference paragraphs 1 through 160 above.

162.    Interested U.S. citizens have recourse to request judicial review of a nonimmigrant visa denial.

163.    Defendants were all government actors acting under color of federal law and regulation.

164.    Plaintiffs are U.S. citizens seeking judicial review of Defendants' denial of Contreras' F-1 nonimmigrant student visa at the George Bush Intercontinental Airport in Houston, Texas.

165.    Plaintiffs assert Defendants enticed them to sponsor Contreras through their promotion and administration of the F-1 student visa and STEM OPT programs.

166.    Plaintiffs attest that at all relevant times herein their student designee complied with all conditions and requirements to obtain and maintain nonimmigrant student visa status through short emergency family leaves of absence pursuant to I.N.A. § 101(a)(15)(F)(i); I.N.A. § 214.2(f)(1)(i); I.N.A. § 214.2(f)(4)(i); I.N.A. § 214.2(f)(16)(i); and 8 C.F.R. § 214.1(b)(1).

167.    Defendants determined that Plaintiffs and their student designee violated federal statutes without providing them with procedural due process.

168.    Plaintiffs demand that where an individual faces deprivation of life, liberty, or property, procedural due process mandates that they are entitled to: an unbiased hearing before a proper tribunal; notice of the proposed action and the grounds asserted for it; opportunity to present reasons why the proposed action should not be taken; the right to present evidence, including the right to call witnesses; the right to know opposing evidence; the right to cross-examine adverse witnesses; a decision based exclusively on the evidence presented; the opportunity to be

represented by counsel, the requirement that a record of the evidence presented be prepared; the requirement that the tribunal prepare written findings of fact and reasons for its decision.

169.    Plaintiffs maintain Defendants violated their liberty interests to sponsor the F-1 student visa holder, and potential STEM OPT participant of their choosing, without due process of law.

170.    Plaintiffs' repeated efforts to secure procedural and/or discretionary relief from Defendants have proven unsuccessful.

**WHEREFORE**, Plaintiffs respectfully ask the Court to:

1. Assume jurisdiction over this matter;

2. Review the denial of Contreras' F-1 nonimmigrant student visa;

3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain nonimmigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9. Declare that Defendants' procedures, policies, practices, and customs deprived Plaintiffs of their liberty interests to sponsor the F-1 student visa holder, and potential STEM OPT participant, of their choosing in violation of the due process protections of the Fifth Amendment of the United States Constitution, the Immigration and Nationality Act, and the Administrative Procedures Act;

10. Find that the procedures, policies, practices, and customs used by Defendants to deny Plaintiffs' student designee admission to the United States were not facially legitimate or bona fide when balanced with Plaintiffs' constitutionally protected liberty interests and violated legal duties owed to Plaintiffs under Fifth Amendment of the United States Constitution, the Immigration and Nationality Act, and the Administrative Procedures Act;

11. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

12. Grant such other and further relief as may be just and proper.

## COUNT II

**Judicial Review of F-1 Student Visa Denial – Violation of Property Interests**

171.    Plaintiffs re-allege and incorporate the paragraphs 1-170 above.

172.    Plaintiffs assert Defendants violated their property interests while sponsoring an F-1 student visa holder, and potential STEM OPT participant of their choosing, without providing them with procedural due process.

173.    Plaintiffs' vested scholarship and sponsorship monies, required by the F-1 student visa program and ACCC sponsorship agreements, were lost when Defendants denied Contreras' F-1 nonimmigrant student visa without due process of law.

174.    Plaintiffs' repeated efforts to secure procedural and/or discretionary relief from Defendants have proven unsuccessful.

**WHEREFORE**, Plaintiffs respectfully ask the Court to:

        1. Assume jurisdiction over this matter;

        2. Review the denial of Contreras' F-1 nonimmigrant student visa;

        3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

        4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

        5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

        6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain non-immigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9. Declare that Defendants' procedures, policies, practices, and customs deprived Plaintiffs of their property interests while sponsoring an F-1 student visa holder, and potential STEM OPT participant of their choosing, in violation of the due process protections of the Fifth Amendment of the United States Constitution, the Immigration and Nationality Act, and the Administrative Procedures Act;

10. Find that the procedures, policies, practices, and customs used by Defendants to deny Plaintiffs' student designee admission to the United States were not facially legitimate or bona fide when balanced with Plaintiffs' constitutionally protected property interests and violated legal duties owed to Plaintiffs under Fifth Amendment of the United States Constitution, the Immigration and Nationality Act, and the Administrative Procedures Act;

11. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

12. Grant such other and further relief as may be just and proper.

## COUNT III

### 42 U.S. Code § 1983 - Violation of Fifth Amendment Due Process Rights

175.   Plaintiffs re-allege and incorporate the paragraphs 1-174 above.

176.   42 U.S.C. § 1983 allows individuals to initiate a civil action for deprivation of rights under the Fifth Amendment.

177.   Plaintiffs argue Defendants' procedures, policies, practices or customs violated Plaintiffs' Fifth Amendment procedural due process rights pursuant to 42 U.S.C. § 1983.

178.   Plaintiff contend that they, without notice or opportunity to defend, were accused by Defendants of engaging in the unlawful employment of an alien student, by allegedly providing partial tuition, sponsorship, and room and board as "fee-for-service," without due process of law.

179.   Plaintiffs maintain Defendants, in making said independent non-reviewable determination created a public record accusing them of violating 8 U.S.C. § 1324a, a federal statute which makes it unlawful to employ an alien without work authorization.

180.   Defendants never provided Plaintiffs with notice of their conclusions, or even a copy of the Form I-860 Determination of Inadmissibility, and in so doing deprived Plaintiffs of fair notice and constitutionally protected liberty and property interests without procedural due process as required by the Due Process Clause of the Fifth Amendment of the United States Constitution.

181.   Plaintiffs assert said independent and non-reviewable decision is an open public record violative of Plaintiffs' Fifth Amendment procedural due process rights because it failed to allow for: an unbiased hearing before a proper tribunal before publication; notice of the proposed action and the grounds asserted for it; the opportunity to present reasons why the proposed record should not have been created; the right to present evidence or call witnesses; the right to

know opposing evidence; the right to cross-examine adverse witnesses; a decision based exclusively on evidence presented; the opportunity to be represented by counsel; a prepared record of the evidence presented; and tribunal-prepared written findings of fact and reasons for the decision.

182.    Defendants' independent and non-reviewable decision caused Plaintiffs to lose vested scholarship and sponsorship monies, required by the F-1 student visa program and ACCC's Sponsorship Agreement Form for International Students, Confidential Financial Statement for International Students, and Sponsor's Affidavit of Free Room and Board, without due process of law.

183.    Plaintiffs' repeated efforts to secure procedural and/or discretionary relief from Defendants have proven unsuccessful.

**WHEREFORE**, Plaintiffs respectfully ask the Court to:

1. Assume jurisdiction over this matter;

2. Review the denial of Contreras' F-1 nonimmigrant student visa;

3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain non-immigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9. Declare that Defendants' procedures, policies, practices, and customs deprived Plaintiffs of procedural due process protections while sponsoring an F-1 student visa holder, and potential STEM OPT participant of their choosing, in violation of the Fifth Amendment of the United States Constitution, 42 U.S.C. § 1983, and the Administrative Procedures Act;

10. Find that the procedures, policies, practices, and customs used by Defendants to deny Plaintiffs' student designee admission to the United States were not facially legitimate or bona fide when balanced with Plaintiffs' constitutionally protected due process rights and violated legal duties owed to Plaintiffs under Fifth Amendment of the United States Constitution, 42 U.S.C. § 1983, and the Administrative Procedures Act;

11. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

12. Grant such other and further relief as may be just and proper.

## COUNT IV

### 42 U.S. Code § 1983 – Defendants' Procedures are Void-for-Vagueness

184.    Plaintiffs re-allege and incorporate the paragraphs 1-183 above.

185.    42 U.S.C. § 1983 allows individuals to initiate a civil action for deprivation of rights under the Fifth Amendment.

186.    Plaintiffs argue Defendants' procedures, policies, practices or customs were unconstitutionally vague and arbitrarily and capriciously deprived them of Fifth Amendment procedural due process rights pursuant to 42 U.S.C. § 1983.

187.    Plaintiffs assert Defendants' vague procedures, policies, practices or customs resulted in unpredictable and arbitrary enforcement of federal statutes, failed to provide fair notice, and deprived Plaintiffs of liberty and property interests without due process of law.

188.    Plaintiffs submit that, where an ordinary person cannot reasonably understand what conduct is prohibited by the statutes and procedures used by government agencies, such statutes and procedures are arbitrary, discriminatory, and unconstitutionally void-for-vagueness.

189.    Plaintiffs charge that Defendants' blanket law enforcement discretion created a "convenient tool" for harsh, discriminatory, and arbitrary enforcement.  Defendants followed a vague procedure that allowed them to fabricate a narrative to obtain a result that deprived Plaintiffs of due process.

190.    Plaintiffs contend that Defendants' vague procedures created more unpredictability and arbitrariness than the Due Process Clause tolerates.  Such vague procedures may not be used in the immigration context because deportation has been deemed a "particularly severe penalty."

191.    Defendants' unconstitutionally vague procedures led to a decision which caused Plaintiffs to lose vested scholarship and sponsorship monies, required by the F-1 student visa program and

ACCC's Sponsorship Agreement Form for International Students, Confidential Financial Statement for International Students, and Sponsor's Affidavit of Free Room and Board, without due process of law.

192.    Plaintiffs' repeated efforts to secure procedural and/or discretionary relief from Defendants have proven unsuccessful.

**WHEREFORE**, Plaintiffs respectfully ask the Court to:

1. Assume jurisdiction over this matter;

2. Review the denial of Contreras' F-1 nonimmigrant student visa;

3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain non-immigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9.  Declare that Defendants' procedures, policies, practices, and customs were unconstitutionally void-for-vagueness and thus deprived Plaintiffs of procedural due process protections while sponsoring an F-1 student visa holder, and potential STEM OPT participant of their choosing, in violation of the Fifth Amendment of the United States Constitution, 42 U.S.C. § 1983, and the Administrative Procedures Act;

10. Find that the procedures, policies, practices, and customs used by Defendants to deny Plaintiffs' student designee admission to the United States were unconstitutionally void-for-vagueness and violated legal duties owed to Plaintiffs under Fifth Amendment of the United States Constitution, 42 U.S.C. § 1983, and the Administrative Procedures Act;

11. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

12. Grant such other and further relief as may be just and proper.

## COUNT V

### 42 U.S. Code § 1983 – Defendants Failed to Provide Adequate Notice

193.   Plaintiffs re-allege and incorporate the paragraphs 1-192 above.

194.   42 U.S.C. § 1983 allows individuals to initiate a civil action for deprivation of rights under the Fifth Amendment.

195.   Plaintiffs argue Defendants' procedures, policies, practices or customs were void-for-vagueness and deprived them of Fifth Amendment procedural due process rights pursuant to 42 U.S.C. § 1983.

196.   Plaintiffs assert Defendants' vague procedures, policies, practices or customs resulted in unpredictable and arbitrary enforcement of federal statutes, failed to provide fair notice, and deprived Plaintiffs of liberty and property interests without due process of law.

197.   Plaintiffs submit that, where an ordinary person cannot reasonably understand what conduct is prohibited by the statutes and procedures used by Defendants, such statutes and procedures are arbitrary, discriminatory, and unconstitutionally void-for-vagueness.

198.    Plaintiffs aver that Defendants did not provide notice of precisely what student visa sponsor family activities and household chores would be considered "employment" pursuant to the I.N.A.  Failure to provide fair notice of said prohibited activities and chores risks converting innocuous activities into infractions.  In so doing, Defendants deprived Plaintiffs of fair notice and other constitutionally protected liberty and property interests without procedural due process as required by the Due Process Clause of the Fifth Amendment of the United States Constitution.

199.   Defendants' vague procedures "devolved into guesswork and intuition," resulted in arbitrary enforcement, and failed to provide Plaintiffs with fair notice, the most basic of due

process's customary protections, and thereby unconstitutionally infringed on Plaintiffs' liberty and property interests.

200.    Defendants' failure to provide Plaintiffs with fair notice led to a decision which caused Plaintiffs to lose vested scholarship and sponsorship monies, required by the F-1 student visa program and ACCC's Sponsorship Agreement Form for International Students, Confidential Financial Statement for International Students, and Sponsor's Affidavit of Free Room and Board, without due process of law.

201.    Plaintiffs' repeated efforts to secure procedural and/or discretionary relief from Defendants have proven unsuccessful.

**WHEREFORE**, Plaintiffs respectfully ask the Court to:

1. Assume jurisdiction over this matter;

2. Review the denial of Contreras' F-1 nonimmigrant student visa;

3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain non-immigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9. Declare that Defendants' procedures, policies, practices, and customs were unconstitutionally void-for-vagueness and thus deprived Plaintiffs fair notice, the most basic of due process protections, while sponsoring an F-1 student visa holder, and potential STEM OPT participant of their choosing, in violation of the Fifth Amendment of the United States Constitution, 42 U.S.C. § 1983, and the Administrative Procedures Act;

10. Find that the procedures, policies, practices, and customs used by Defendants to deny Plaintiffs' student designee admission to the United States were unconstitutionally void-for-vagueness and violated fair notice requirements due to Plaintiffs under Fifth Amendment of the United States Constitution, 42 U.S.C. § 1983, and the Administrative Procedures Act;

11. Precisely define which sponsor family activities and/or household chores are considered prohibited employment by the I.N.A. and which are merely voluntary participation in activities integral to the cultural exchange inherent to F-1 nonimmigrant student visa program.

12. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

13. Grant such other and further relief as may be just and proper.

## COUNT VI

### Fifth Amendment Due Process Requires Procedures for this Particular Situation

202.   Plaintiffs re-allege and incorporate the paragraphs 1- 201 above.

203.   42 U.S.C. § 1983 allows individuals to initiate a civil action for deprivation of rights under the Fifth Amendment.

204.   Plaintiffs argue Defendants' procedures, policies, practices or customs were void-for-vagueness and deprived them of Fifth Amendment procedural due process rights pursuant to 42 U.S.C. § 1983.

205.   Plaintiffs propound the case at bar is a "particular situation" where Defendants' interests in enforcing immigration laws and port-of entry security must be balanced against Plaintiffs' liberty and property interests in sponsorship and participation in the F-1 student visa and STEM OPT programs.

206.   Plaintiffs insist their interests were negatively affected in this "particular situation" by Defendants failing to provide procedures that would have guaranteed due process protections.

207.   Plaintiffs submit that additional or substitute procedures, such as temporary admission of their student designee via Port Parole or after service of Form I-515A with a proofs hearing held shortly thereafter, would have had greater probative value and would have significantly reduced the risk of erroneous deprivation of Plaintiffs' constitutionally protected liberty and property interests.

208.    Plaintiffs maintain the burdens such temporary admission and hearing procedures would have presented to Defendants are minimal, in both in fiscal and administrative terms.

209.   The vague procedures used by Defendants "devolved into guesswork and intuition," resulted in arbitrary enforcement, and failed to provide Plaintiffs with adequate procedures for

this "particular situation" and thereby unconstitutionally infringed on Plaintiffs' liberty and property interests.

210.   Defendants failed to provide Plaintiffs with adequate procedures for this "particular situation" leading to a decision which caused Plaintiffs to lose vested scholarship and sponsorship monies, required by the F-1 student visa program and ACCC's Sponsorship Agreement Form for International Students, Confidential Financial Statement for International Students, and Sponsor's Affidavit of Free Room and Board, without due process of law.

211.   Plaintiffs' repeated efforts to secure procedural and/or discretionary relief from Defendants have proven unsuccessful.

**WHEREFORE**, Plaintiffs respectfully ask the Court to:

1. Assume jurisdiction over this matter;

2. Review the denial of Contreras' F-1 nonimmigrant student visa;

3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain non-immigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9. Declare that Defendants' procedures, policies, practices, and customs were unconstitutionally inadequate for this "particular situation," where Defendants' interests in enforcing immigration laws and port-of-entry security must be balanced against Plaintiffs' liberty and property interests in sponsorship and participation in the F-1 student visa and STEM OPT programs, in violation of the Fifth Amendment of the United States Constitution, 42 U.S.C. § 1983, and the Administrative Procedures Act;

10. Find that Defendants' procedures, policies, practices, and customs in this "particular situation" unconstitutionally infringed upon Plaintiffs' liberty and property interests.

11. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

12. Grant such other and further relief as may be just and proper.

## COUNT VII

### Due Process Protects a U.S. Citizen's Right to Promote the General Welfare

212.    Plaintiffs re-allege and incorporate the paragraphs 1- 211 above.

213.    42 U.S.C. § 1983 allows individuals to initiate a civil action for deprivation of rights under the Fifth Amendment.

214.    Plaintiffs argue Defendants' procedures, policies, practices or customs were void-for-vagueness and deprived them of Fifth Amendment procedural due process rights pursuant to 42 U.S.C. § 1983.

215.    Plaintiffs contend that, like all private entities and individuals who pledge time, money, and other resources to participate in the F-1 visa and STEM OPT programs, they were enticed by Defendants to serve as sources of tuition, scholarships, and sponsorships for a student designee.

216.    Plaintiffs reason that, as a consequence of being enticed to participate in the F-1 visa and STEM OPT programs, they promoted the "general welfare" equally with federal government partners.

217.    Plaintiffs assert that the right of private entities and individuals to promote and provide for the "general welfare," through F-1 visa program sponsorship and partnership with the federal government, is absolute until due process produces a finding citing legitimate reasons to take away that right.

218.    Defendants' vague and insufficient procedures denied Plaintiffs, as private entities and individuals in partnership with the federal government in sponsoring the F-1 visa and STEM OPT programs, the "minimum requirements" of due process and thereby unconstitutionally infringed their right to promote the "general welfare."

219.   Defendants' failure to provide Plaintiffs with the "minimum requirements" of due process led to a decision which caused Plaintiffs to lose vested scholarship and sponsorship monies, required by the F-1 student visa program and ACCC's Sponsorship Agreement Form for International Students, Confidential Financial Statement for International Students, and Sponsor's Affidavit of Free Room and Board, without due process of law.

220.   Plaintiffs' repeated efforts to secure procedural and/or discretionary relief from Defendants have proven unsuccessful.

**WHEREFORE**, Plaintiffs respectfully ask the Court to:

1. Assume jurisdiction over this matter;

2. Review the denial of Contreras' F-1 nonimmigrant student visa;

3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain non-immigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9. Find Plaintiffs were enticed by Defendants to serve as sources of tuition loans, grants, scholarships, and sponsorships for F-1 visa recipients.

10. Hold Plaintiffs pledged time, money, and other resources to participate in the F-1 visa and STEM OPT programs and, as a consequence, promoted the "general welfare" equally with federal government partners.

11. Declare the Plaintiffs' right to promote and provide for the "general welfare" through participation in the F-1 visa and STEM OPT programs is a protected right, not a privilege or entitlement, preserved by the "People of the United States."

12. Further declare that Defendants' procedures, policies, practices, and customs unconstitutionally infringed upon Plaintiffs' protected right to promote and provide for the "general welfare" through participation in the F-1 visa and STEM OPT programs in violation of the Fifth Amendment of the United States Constitution, 42 U.S.C. § 1983, and the Administrative Procedures Act;

13. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

14. Grant such other and further relief as may be just and proper.

## COUNT VIII

### Student Designee Never Relinquished, Terminated, or Gave Up Student Status

221.    Plaintiffs re-allege and incorporate the paragraphs 1- 220 above.

222.    Plaintiffs assert that, at all relevant times herein, their student designee complied with any and all conditions and requirements to obtain and maintain nonimmigrant student visa status through short emergency family leaves of absence pursuant to I.N.A. § 101(a)(15)(F)(i); I.N.A. § 214.2(f)(1)(i); I.N.A. § 214.2(f)(4)(i); I.N.A. § 214.2(f)(16)(i); and 8 C.F.R. § 214.1(b)(1).

223.    Plaintiffs argue the nature and circumstances surrounding their student designee's absences prove she did not relinquish, terminate, or give up the intent of continuing her studies. Tragic circumstances were "thrust upon her" and, as such, she could not have acted "affirmatively to terminate or to abandon" her course of study.

224.    Plaintiffs maintain Defendants' unconstitutionally vague and insufficient procedures led them to the erroneous conclusion that Plaintiffs' student designee had relinquished, terminated, or given up her college studies to be unlawfully employed as a "housekeeper."

225.    Plaintiffs declare Defendants' erroneous and biased conclusions caused Plaintiffs to lose vested scholarship and sponsorship monies, required by the F-1 student visa program and ACCC's Sponsorship Agreement Form for International Students, Confidential Financial Statement for International Students, and Sponsor's Affidavit of Free Room and Board, without due process of law.

226.    Plaintiffs' repeated efforts to secure procedural and/or discretionary relief from Defendants have proven unsuccessful.

**WHEREFORE**, Plaintiffs respectfully ask the Court to:

1. Assume jurisdiction over this matter;

2. Review the denial of Contreras' F-1 nonimmigrant student visa;

3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain non-immigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9. Find that Plaintiffs' student designee never abandoned her student status.

10. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

12. Grant such other and further relief as may be just and proper.

## COUNT IX

### 28 U.S. Code § 1361 - Mandamus Action

227.    Plaintiffs re-allege and incorporate by reference paragraphs 1- 226 above.

228.    Defendants are charged with the responsibility of administering and implementing the Immigration and Nationality Act.

229.    Plaintiffs assert Defendants bear sole responsibility for providing a constitutional, fair, and impartial procedure when inspecting a sponsored nonimmigrant visa holder for admission at a U.S. border port of entry.

230.    Plaintiffs argue Defendants' failure to discharge their statutory obligations under the I.N.A. was injurious to Plaintiffs.

231.    Plaintiffs insist Defendants should be compelled to perform the duties owed to Plaintiffs. Namely, Defendants' officers and employees should be compelled to provide constitutional, fair, and impartial procedures when inspecting a nonimmigrant visa holder, sponsored by a U.S. citizen, for admission at a United States port-of-entry pursuant to 28 U.S.C. § 1361.

**WHEREFORE**, Plaintiffs respectfully ask the Court to:

1. Assume jurisdiction over this matter;

2. Review the denial of Contreras' F-1 nonimmigrant student visa;

3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain non-immigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9. Declare that Defendants' failure to discharge their statutory obligations under the I.N.A. was injurious to Plaintiffs and make a finding that Defendants should be compelled to perform the duties owed to Plaintiffs;

10. Compel Defendants' officers and employees to provide fair and impartial procedures when inspecting a sponsored nonimmigrant F-1 student visa holder for admission at a United States port-of-entry pursuant to 28 U.S.C. § 1361;

11. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

12. Grant such other and further relief as may be just and proper.

## COUNT X

### 5 U.S.C. § 706 - Violation of the Administrative Procedures Act

232.    Plaintiffs re-allege and incorporate by reference paragraphs 1 - 231 above.

233.    Plaintiffs contend that Defendants, by failing to provide constitutional, fair, and impartial procedures when inspecting a U.S. citizen sponsored nonimmigrant student visa holder for admission at a United States port-of-entry, violated Plaintiffs' due process rights under the Fifth Amendment of the United States Constitution and the Administrative Procedures Act and constitutes agency action that is arbitrary and capricious, and not in accordance with law pursuant to 5 U.S.C. § 706(2)(A).

**WHEREFORE**, Plaintiffs respectfully ask the Court to:

1. Assume jurisdiction over this matter;

2. Review the denial of Contreras' F-1 nonimmigrant student visa;

3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain non-immigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9. Declare that Defendants' procedures, policies, practices, and customs constitute arbitrary and capricious agency action that does not accord with law pursuant to 5 U.S.C. § 706(2)(A);

10. Find that the procedures, policies, practices, and customs used by Defendants to deny Plaintiffs' student designee admission to the United States were arbitrary and capricious agency action violating U.S.C. § 706(2)(A), the Fifth Amendment of the United States Constitution, and the Administrative Procedures Act;

11. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

12. Grant such other and further relief as may be just and proper.

## JURY DEMAND

Pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b) Plaintiffs hereby demand a trial by a jury on all of the issues contained herein.

YOUNGBLOOD, FRANKLIN,
SAMPOLI & COOMBS, P.A.



_____
Jorge F. Coombs, Esquire

## DESIGNATION OF TRIAL COUNSEL

Please take notice that Jorge F. Coombs, Esquire, is hereby designated as trial counsel in the above-captioned litigation for the firm of Youngblood, Franklin, Sampoli & Coombs, P.A.

YOUNGBLOOD, FRANKLIN,
SAMPOLI & COOMBS, P.A.

_____
Jorge F. Coombs, Esquire

## PLAINTIFFS' DEMAND FOR DAMAGES AND COSTS

Pursuant to Civ. Rules 8.1 and 54.1 Plaintiffs hereby demand damages and costs from Defendants in an amount to be determined at the time of trial.

YOUNGBLOOD, FRANKLIN,
SAMPOLI & COOMBS, P.A.

_____
Jorge F. Coombs, Esquire

## <u>CERTIFICATION</u>

Pursuant to 28 U.S.C. § 1746 and Local Civ. Rule 11.2 it is hereby certified that the matter in controversy is not the subject of any other action pending in any court or arbitration proceeding and Plaintiffs do not contemplate any other action or arbitration proceeding.

I certify that the foregoing statements made by me are true and correct to the best of my knowledge and information.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

YOUNGBLOOD, FRANKLIN,
SAMPOLI & COOMBS, P.A.

Dated: <u>June 17, 2019</u>          By: _____
Jorge F. Coombs, Esquire
Attorney for Plaintiffs