### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

---

H. FRANK FIFE and JOHN G. AND      1:19-cv-13912-NLH-AMD
ELIZABETH STEELMAN
FOUNDATION,                        **OPINION**

        Plaintiffs,

    v.

WILLIAM P. BARR,KEVIN K.
MCALEENAN, MARK A. MORGAN,
and JUDSON W. MURDOCK, II,

        Defendants.

---

**APPEARANCES**:

JORGE FELIPE COOMBS
YOUNGBLOOD, FRANKLIN, SAMPOLI & COOMBS P.A.
1201 NEW ROAD
SUITE 230
LINWOOD, NJ 08221

    *On behalf of Plaintiffs*

THOMAS BENTON YORK
U.S. DEPARTMENT OF JUSTICE
P.O. BOX 868
BEN FRANKLIN STATION
WASHINGTON, DC 20044

    *On behalf of Defendants*

**HILLMAN**, District Judge

    Plaintiffs claim that the U.S. government defendants violated their various constitutional rights when a student they sponsored for an F-1 nonimmigrant student visa was removed from the country and barred from returning for five years.

Defendants have moved to dismiss Plaintiffs' complaint, and Plaintiffs have moved to stay the five-year bar to the student's reentry.  For the reasons expressed below, Defendants' motion will be granted, and Plaintiffs' motion will be denied as moot.

<u>**BACKGROUND**</u>

In April 2012, Erika Contreras Cruz ("Contreras"), who is a citizen of Mexico, applied to enroll at Atlantic Cape Community College ("ACCC") in Mays Landing, New Jersey through the F-1 nonimmigrant student visa program.  The F-1 nonimmigrant student classification allows a foreign national "having a residence in a foreign country which [she] has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study" at a qualifying educational institution.  8 U.S.C. § 1101(a)(15)(F)(i).

To qualify for an F-1 visa, a foreign national is required to (1) apply and gain admission to an approved U.S. educational institution, (2) obtain a Form I-20, Certificate of Eligibility for Nonimmigrant Student Status ("Form I-20"), issued by an approved school, and (3) submit a visa application at the U.S. Embassy or Consulate where the foreign national resides.  The foreign national is required to demonstrate both an intent to pursue a full course of study at the school named on the Form I-20 as well as an intent to leave the United States upon

2

completion of the course of study or a defined period of authorized practical training.  F-1 visa-holders are admitted for "duration of status," meaning the student is authorized to stay in the United States while he or she is pursuing a full course of study at an approved educational institution or engaging in authorized practical training following the completion of his or her studies.  8 C.F.R. § 214.2(f)(5).  In addition to the full-course-of-study requirement, to maintain F-1 status, a student must not be employed in the United States unless expressly authorized in accordance with the regulations. See 8 C.F.R. §§ 214.2(f)(5),(9) and (10).

Each school authorized to enroll F-1 students must have a Designated School Official ("DSO") who monitors, advises, and oversees the students attending that institution consistent with reporting obligations to Immigration Customs Enforcement ("ICE") through its Student and Exchange Visitor Program ("SEVP").  8 C.F.R. §§ 214.2(f)(1)(iii), 214.3(g), 214.4(a)(2).  DSOs at participating schools must report specific student information, including information pertaining to nonimmigrant students' enrollment and withdrawal from programs of study, through entry into the Student Exchange Visitor Information System ("SEVIS"). Id. § 214.3(g)(1).

In order for ACCC to issue a Form I-20 to an international student, the student is required to complete a "Confidential

Financial Statement for International Students." The financial statement explains: "International students planning to attend Atlantic Cape Community College must verify that sufficient resources are available to enable them to study in the United States. Students must confirm all identified funding sources and amounts for each source, totaling a minimum of $22,000 . . . to cover anticipated costs." (Docket No. 1-1 at 32.) The student is required to sign and certify their financial statement.

Contreras submitted a "Confidential Financial Statement for International Students," which showed that $4,000 of Contreras' first year college costs would be paid from her personal funds, $8,000 would be paid by Contreras' family funds, and the remaining $10,000 would be paid by scholarships or sponsors. Of the $10,000, Plaintiff John G. and Elizabeth Steelman Foundation ("Foundation") contributed $3,500, and Plaintiff H. Frank Fife ("Fife") contributed $6,500. Contreras was connected with Fife through her cousin who was acquainted with Fife's wife. Fife serves as a trustee for the Foundation, which has provided dozens of scholarships and has donated to many charitable organizations over the past thirteen years.

Because Contreras was relying on funds from a scholarship and a sponsorship, Fife completed a "Sponsorship Agreement Form for International Students," in which he certified that he "will

4

act as the student's sponsor while he/she is attending Atlantic
Cape Community College.  This means that I accept responsibility
for his/her tuition and fees, housing, transportation, personal
needs and welfare.  The information below is accurate and
complete."  (Docket No. 1-1 at 24.)

On April 24, 2012, Contreras signed the Form I-20.  The
Form I-20 noted that payment was made in-full for the first
academic year and that Contreras would "reside with host family
at no cost."  (Docket No. 1-1 at 34.)  Fife was required to
execute ACCC's Sponsor's Affidavit of Free Room and Board before
a notary on April 12, 2012.  Fife certified:

> By completing this affidavit, you are swearing to the U.S.
> government that the student named below will live with you
> free of charge for room and board for the entire time he or
> she is a student at Atlantic Cape Community College. **The
> student cannot be required to provide you with any
> services, such as babysitting, cleaning, etc., in exchange
> for the room and board. Do not expect that the student will
> be able to help support the costs through employment.
> Student employment is strictly controlled by U.S.
> Citizenship & Immigration Services and is very limited.** You
> are also proving that you are the person who owns or rents
> the property and can afford the support you are promising.

(Docket No. 1-1 at 38 (emphasis in original).)

On July 19, 2012, the United States Consulate in Monterrey,
Mexico issued Contreras an F-1 nonimmigrant student visa, which
had an expiration date of May 22, 2015.  On August 9, 2012,
Contreras was inspected by U.S. Customs and Border
Protection ("CBP") at the Del Rio, Texas port-of-entry and she

5

was admitted to the United States as a valid F-1 nonimmigrant student.  Contreras began attending ACCC and residing with the Fifes.  Thereafter, Contreras entered and exited the United States to study at ACCC without incident for four years.

On April 22, 2016, Contreras' brother was hit by a motorcycle while walking with his child in Mexico, and he died two days later.  Contreras received approval from ACCC's DOS to take an emergency leave of absence to return to Mexico.

After spending twenty days in Mexico, on May 12, 2016, Contreras returned to the United States, entering through the Houston Intercontinental Airport, to resume her studies at ACCC. It does not appear that Contreras had previously sought to renew her F-1 nonimmigrant student visa which had expired on May 22, 2015.  According to Plaintiffs' complaint, however, an F-1 nonimmigrant student visa holder can automatically revalidate an expired visa when returning to the United States from an absence of less than thirty days to a contiguous territory provided she is in possession of a valid passport, a Form I-94 issued in connection with a previous admission, and a valid Form I-20. (Docket No. 1 at 32 ¶ 92, citing 8 C.F.R. § 214.1(b)(1).) Plaintiffs' complaint avers that they believe Contreras' F-1 nonimmigrant student visa was revalidated at that time under 8 C.F.R. § 214.1(b)(1).  The complaint does not show that Contreras had any issue entering the United States on May 12,

6

2016.

On June 22, 2016, Contreras' other brother went missing from his home in Mexico under mysterious circumstances, and his body was found six days later.  On August 3, 2016, an ACCC DSO reissued Contreras' Form I-20 with a revised program end date of May 19, 2017.  The DSO noted in the Form I-20 "Remarks" section that, at that point in time, Contreras still needed two semesters to complete her associates degree.  The DSO also granted Contreras' request for a second emergency leave of absence from her studies in order to attend her brother's funeral.

On September 21, 2016, twenty-five days after leaving the United States, Contreras sought readmission through the Del Rio, Texas, port-of-entry.  Plaintiffs' complaint avers that CBP inspected Contreras and allowed her admission pursuant to the 8 C.F.R. 214.1(b)(1) automatic visa revalidation procedure as it had done on May 12, 2016.

It appears that Contreras did not attend classes at ACCC in the 2016 fall semester, but on November 28, 2016, Contreras registered for her spring 2017 ACCC courses.  Because of more family issues, Contreras traveled to Mexico on December 1, 2016, and returned to the United States on December 27, 2016.  Contreras sought admission into the United States at the Del Rio, Texas, port-of-entry.  CBP officers initially refused

Contreras reentry because SEVIS showed her student status as "Terminated."

Previously and allegedly unbeknownst to Contreras, on September 12, 2016, an ACCC DSO entered Contreras' leave of absence on SEVIS as an "Authorized Early Withdrawal," and SEVIS changed Contreras' student status from "Active" to "Terminated."  Contreras' name was also flagged on DHS's Treasury Enforcement Communications System ("TECS").  TECS is a computer application that allows CBP officers, and other federal agents, access to numerous operational records and databases relevant to antiterrorism and law enforcement.  In a remarks section dated September 14, 2016, CBP noted:

> For POE only: SEVIS ID# N0009170337 is no longer valid. Do not allow entry as F1, F2, M1, M2, J1, or J2 if I-20/DS-2019 has this SEVIS ID without verifying status in SEVIS. If subject is out of status, take appropriate action.  This flag does not apply to entry with a different SEVIS ID or other classes of admission. Do not use as the sole means for refusing admission or benefit. If this SEVIS ID is valid, report disposition to ICE SEVP [redacted pursuant to (b)(6), (b)(7)(c)].

(Docket No. 1 at 34.)

Del Rio CBP allowed Contreras to telephone ACCC's international student office to inquire regarding her student status, and an ACCC DSO submitted a correction request to SEVIS requesting that Contreras be returned to "Active" student status.  A DHS officer also updated SEVIS to show Contreras' student status as "Pending."  Plaintiffs claim that on January

8

3, 2017, Del Rio CBP noted Contreras' "Pending" student status correction request in the SEVIS system and, once again, allowed her to reenter the United States via the 8 C.F.R. § 214.1(b)(1) automatic F-1 nonimmigrant student visa revalidation process.

On January 19, 2017, a DHS officer updated Contreras' SEVIS status to "Active" and annotated her Student Status Change Date accordingly.  On February 17, 2017 an ACCC DSO reissued Contreras' Form I-20 (# N0009170337) and extended her associate's degree program end date until December 22, 2017. The "Remarks" section noted that Contreras had "needed to unexpectedly leave the U.S. to address emergency family issues" and would "try to return for the Spring 2017 semester." Contreras attended and successfully completed her ACCC Spring 2017 semester coursework.

On July 2, 2017, Contreras flew to Mexico for summer break. On July 29, 2017, Contreras flew from Mexico to the George Bush Intercontinental Airport in Houston, Texas.  When she arrived, Contreras was detained by Houston CBP officers and questioned for many hours.

Plaintiffs' complaint alleges that even though Contreras satisfied the requirements of the F-1 nonimmigrant student visa - that she must maintain a full course load, not be engaged in any employment without authorization of DHS, have an accurate SEVIS record, and not be past the program end date indicated on

9

her Form I-20 - CBP officers misconstrued Contreras'

relationship with the Fifes.  Plaintiffs allege that despite

Contreras' explanations to the contrary, CBP concluded that

Contreras' tuition was fee-for-service compensation, and that

Contreras was employed as Fife's housekeeper.[1]  Plaintiffs'

complaint relates:

> The Houston Statement [of CBP officers] shows Contreras was
> a full-time college student who, as part of the cultural
> exchange that inherently occurs between F-1 visa students
> and their host families, occasionally participated in
> Plaintiff Fife's household activities.  The Houston
> Statement also shows Houston CBP officers failed to
> distinguish between the common courtesies of an
> appreciative houseguest from the types of services provided
> by paid employees.  Said impasse in understanding could
> either be attributed to Contreras' admitted English
> language deficiencies or the prejudices and biases of
> Houston CBP officers.  The obligations and employment
> limitations of ACCC's Sponsorship Agreements and Financial
> Statement, the Foundation scholarship award letter, and
> Contreras' answers to Houston CBP show her understanding
> that she could not, and did not, work for compensation of
> any kind.

(Docket No. 1 at 41-42.)  Plaintiffs further claim that

Contreras acted without immigrant intent, she had the income and

assets she claimed, and she was an F-1 nonimmigrant student

looking to further her college studies in the United States.

Plaintiffs also claim that CBP officers misinterpreted

Contreras' intention to work for Plaintiffs following the

---

[1] The CBP noted that Contreras began her two-year associate's
degree in September 2012 but to date five years later she still
had not earned that degree.  (Docket No. 1-1 at 147.)

completion of her degree through her participation the STEM OPT
program, which allows F-1 nonimmigrant students to remain in the
United States after finishing their degree to work in the public
sector for designated time periods.

Additionally, Plaintiffs claim that Contreras knew the
automatic visa revalidation procedure and had no reason to
believe her F-1 visa had not been revalidated when she was
readmitted to the United States on January 3, 2017.  Plaintiffs
claim that Contreras understood that as long as a leave of
absence outside of the United States was not for more than
thirty days, even an expired Form I-20 could be revalidated
pursuant to 8 C.F.R. § 214.1(b)(1).

On July 30, 2017, Houston CBP created a Record of
Deportable/Inadmissible Alien listing Contreras' occupation as
"housekeeping," her salary as "0" (zero), and the name of
her employer as "Frank Fife."  Houston CBP issued a Form I-860
Determination of Inadmissibility under INA § 212(a)(7)(A)(i)(I).
The "Notice and Order of Expedited Removal" informed Contreras:

> You are an immigrant not in possession of a valid unexpired
> immigrant visa, reentry permit, border crossing card, or
> other valid entry document required by the [INA], to wit:
> you previously engaged in unauthorized employment, you do
> not have a valid entry document and being an immigrant
> without documents as you cannot overcome the presumption of
> being an intended immigrant.

(Docket No. 1-1 at 149-50.)  Contreras was ordered removed and
was imposed a five-year bar to reentry as an "intending

immigrant." Houston CBP stamped "CANCELLED" five times across Contreras' passport containing the F-1 visa.

Plaintiffs' complaint details the CBP officers' alleged errors and the steps that they should have undertaken:

> Houston CBP officers chose to disregard Del Rio CBP's Form I-94 (#20242749185) as proof of Contreras' prior visa revalidation and valid readmission to the United States on January 3, 2017. They also disregarded Contreras' "Active" SEVIS status and completed ACCC Spring 2017 coursework. Instead, Houston CBP followed a biased "employee housekeeper" narrative fabricated to ensure maximum punitive consequences to both Contreras and Plaintiffs. Plaintiffs argue Defendants cannot retroactively impute nonconforming and unlawful behavior to Contreras and/or Plaintiffs prior to her January 19, 2017 visa reinstatement by SEVP's District Director. Logic and fairness dictate no other result.

> Assuming, arguendo, that Del Rio CBP had mistakenly admitted Contreras on January 3, 2017, no rational public safety or national security goals are advanced by Houston CBP classifying Contreras as an inadmissible "intending immigrant" and imposing a five (5) year reentry ban. At most, Houston CBP should have processed Contreras as an innocuous withdrawn entry.

> Even if Houston CBP had concerns regarding the validity of Contreras' SEVIS status or ACCC enrollment, they should have still admitted her via Port Parole under I.N.A. § 212(d)(5) or after issuing a Form I-515A - Notice to Student or Exchange Visitor. Furthermore, Defendants had due process obligations to provide Plaintiffs with a hearing, held perhaps thirty (30) days after the student designee's temporary admission date, to review the alleged grounds for inadmissibility. Such a process would have allowed Plaintiffs to meet with their student designee and counsel, acquire relevant supporting documents, and draft responsive submissions supporting the legal basis for the requested admission. A hearing, held a short time after Port Parole or service of Form I-515A, would have allowed Plaintiffs and Defendants opportunity to prepare and deliberate without the inconvenience, stress, and time restraints of hasty decisions made at a port-of-entry.

(Docket No. 1 at 50-51.)

Contreras, through Fife, requested that CBP rescind her expedited removal and five-year ban, but on March 26, 2018, CBP declined that request.  Contreras desired to continue her classes at ACCC for the 2018 fall semester under the same arrangement with the Foundation and Fife, and on May 16, 2018, ACCC sent Contreras a reenrollment confirmation and issued her a new Form I-20.  At the United States consulate in Mexico, Contreras was denied a new F-1 nonimmigrant student visa.

The Foundation and Fife claim numerous due process violations to their liberty and property interests as a result of Contreras' expedited removal.  Plaintiffs claim that their liberty and property interests arise from their sponsorship and scholarship to Contreras as an F-1 nonimmigrant student visa holder.  Plaintiffs claim that they have constitutionally protected liberty interests in F-1 student visa program participation, particularly when Defendants have enticed their participation in the program, and they have constitutionally protected property interests in the sponsorship and scholarship monies they provided to Contreras, their student designee. Plaintiffs further claim that Defendants determined that Plaintiffs and Contreras violated federal statutes without providing them with procedural due process.

13

For each of their ten counts[2] lodged against Defendants,[3]

Plaintiffs seek the following relief:

1. Assume jurisdiction over this matter;

2. Review the denial of Contreras' F-1 nonimmigrant student visa;

3. Affirm Defendants' January 3, 2017 revalidation and January 19, 2017 reinstatement of Contreras' F-1 nonimmigrant student visa and Form I-20;

4. Order Defendants to revalidate and reinstate Contreras' F-1 nonimmigrant student visa and Form I-20 without further delay;

5. Remove Contreras' five (5) year ban on reentry and allow her to reenter the United States upon presentment of said revalidated and reinstated F-1 nonimmigrant student visa and Form I-20;

---

[2] Count I - Judicial Review of F-1 Student Visa Denial – Violation of Liberty Interests; Count II - Judicial Review of F-1 Student Visa Denial – Violation of Property Interests; Count III - 42 U.S. Code § 1983 - Violation of Fifth Amendment Due Process Rights; Count IV - 42 U.S. Code § 1983 – Defendants' Procedures are Void-for-Vagueness; Count V - 42 U.S. Code § 1983 – Defendants Failed to Provide Adequate Notice; Count VI - Fifth Amendment Due Process Requires Procedures for this Particular Situation; Count VII - Due Process Protects a U.S. Citizen's Right to Promote the General Welfare; Count VIII - Student Designee Never Relinquished, Terminated, or Gave Up Student Status; Count IX - 28 U.S. Code § 1361 - Mandamus Action; and Count X - 5 U.S.C. § 706 - Violation of the Administrative Procedures Act.

[3] Defendants are William P. Barr, Attorney General of the United States and executive of the U.S. Department of Justice; Kevin K. McAleenan, Acting Secretary for the U.S. Department of Homeland Security and Commissioner for U.S. Customs and Border Protection; Mark A. Morgan, Acting Director for U.S. Immigration and Customs Enforcement; and Judson W. Murdock, II, Houston CBP Director of Field Operations who has supervisory authority over CBP operations at the George Bush Intercontinental Airport in Houston, Texas.

14

6. Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers;

7. Correct all pertinent government records, including TECS flags, to reflect Contreras has always complied with all conditions and requirements to obtain and maintain nonimmigrant F-1 student visa status;

8. Correct all pertinent government records, including TECS flags, to reflect Contreras has never worked in the United States;

9. Declare that Defendants' procedures, policies, practices, and customs deprived Plaintiffs of their liberty interests to sponsor the F-1 student visa holder, and potential STEM OPT participant, of their choosing in violation of the due process protections of the Fifth Amendment of the United States Constitution, the Immigration and Nationality Act, and the Administrative Procedures Act;

10. Find that the procedures, policies, practices, and customs used by Defendants to deny Plaintiffs' student designee admission to the United States were not facially legitimate or bona fide when balanced with Plaintiffs' constitutionally protected liberty interests and violated legal duties owed to Plaintiffs under Fifth Amendment of the United States Constitution, the Immigration and Nationality Act, and the Administrative Procedures Act;

11. Award Plaintiffs lost scholarship and sponsorship monies, reasonable attorney's fees, and litigation costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

12. Grant such other and further relief as may be just and proper.

(Docket No. 1 at 54-79.)

Defendants have moved to dismiss Plaintiffs' complaint in its entirety on several bases.  The two primary bases for dismissal are that this Court lacks subject matter jurisdiction over Plaintiffs' challenge to Contreras' expedited removal, and

that Plaintiffs otherwise lack standing to assert their claims.
Plaintiffs have opposed Defendants' motion, and have filed a
separate motion asking this Court to stay the imposition of the
five-year bar to Contreras' reentry to this country.

## DISCUSSION

### A.   Subject matter jurisdiction

The purported basis for this Court's subject matter
jurisdiction over this action is under 28 U.S.C. §§ 1331, 1361,
and 2201.

### B.   Analysis

"Absent Article III standing, a federal court does not have
subject matter jurisdiction to address a plaintiff's claims, and
they must be dismissed."  Common Cause of Pennsylvania v.
Pennsylvania, 558 F.3d 249, 257 (3d Cir. 2009) (quoting
Taliaferro v. Darby Tp. Zoning Bd., 458 F.3d 181, 188 (3d Cir.
2006)).  Challenges to subject matter jurisdiction under Federal
Civil Procedure Rule 12(b)(1) may be facial or factual.  Id.
Facial attacks – which Defendants mount here – contest the
sufficiency of the pleadings, and the trial court must accept
the complaint's allegations as true.  Id.  "At the pleading
stage, general factual allegations of injury resulting from the
defendant[s'] conduct may suffice, for on a motion to dismiss we
presume that general allegations embrace those specific facts
that are necessary to support the claim."  Id. (quoting Lujan v.

16

Defenders of Wildlife, 504 U.S. 555, 561 (1992)).  Plaintiffs, as the parties invoking the federal courts' jurisdiction, bear the burden of establishing their standing.  Id. (citation omitted).

Standing implicates both constitutional requirements and prudential concerns.  Id. (citation omitted).  A federal court "[a]lways . . . must balance the heavy obligation to exercise jurisdiction against the deeply rooted commitment not to pass on questions of constitutionality unless adjudication of the constitutional issue is necessary."  Id. (quotations, citations omitted).  Article III's standing requirement "is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power," and invoking the power of the federal judiciary requires more than important issues and able litigants.  Id. (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 476 (1982)).

With regard to the constitutional standing requirements, "Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'  That case or controversy requirement is satisfied only where a plaintiff has standing."  Id. at 257-58 (quoting Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269 (2008)).

In order to have Article III standing, a plaintiff must adequately establish:

(1) an injury in fact (i.e., a "concrete and particularized" invasion of a "legally protected interest");

(2) causation (i.e., a "fairly traceable" connection between the alleged injury in fact and the alleged conduct of the defendant); and

(3) redressability (i.e., it is "likely" and not "merely speculative" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).  Id. (quoting Sprint Commc'ns Co., 128 S. Ct. at 2535 (quoting Lujan, 504 U.S. at 560-61) (further quotation, alterations omitted)).

As for the prudential standing requirements, this principle "embodies judicially self-imposed limits on the exercise of federal jurisdiction."  Id. (quoting Elk Grove Unified Sch. Dist., 542 U.S. at 11).  "Although the Supreme Court has not exhaustively defined the prudential dimensions of the standing doctrine, [the Court has] explained that prudential standing encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  Id. (citation omitted).

18

"Without such limitations - closely related to Art. III concerns but essentially matters of judicial self-governance - the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights."   Id. at 259 (citation omitted).

In this case, even accepting all of Plaintiffs' factual allegations as true, Plaintiffs have not met their burden to show that they meet the constitutional and prudential factors to confer standing to bring their claims.[4]

---

[4] In addition to arguing that Plaintiffs lack standing to bring their claims, Defendants have also moved to dismiss Plaintiffs' claims for lack of subject matter jurisdiction because their claims all seek judicial review of Contreras' expedited removal order, and such claims are barred, even if they were asserted by Contreras herself.  The Third Circuit has explained the scope of judicial review for orders of removal:

Section 1252 of Title 8 defines the scope of judicial review for all orders of removal.  This statute narrowly circumscribes judicial review for expedited removal orders issued pursuant to § 1225(b)(1).  It provides that "no court shall have jurisdiction to review . . . the application of [§ 1225(b)(1) ] to individual aliens, including the [credible fear] determination made under [§ 1225(b)(1)(B) ]."  8 U.S.C. § 1252(a)(2)(A)(iii).  Moreover, except as provided in § 1252(e), the statute strips courts of jurisdiction to review: (1) "any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an [expedited removal] order"; (2) "a decision by the Attorney General to invoke" the expedited removal regime; and (3) the "procedures and policies adopted by the Attorney General to implement the provisions of [§

1225(b)(1) ].” Id. § 1252(a)(2)(A)(i), (ii) & (iv).  Thus,
the statute  makes abundantly clear that whatever
jurisdiction courts have to review issues relating to
expedited removal orders arises under § 1252(e).

Section 1252(e), for its part, preserves judicial
review for only a small subset of issues relating to
individual expedited removal orders: (A) whether the
petitioner is an alien, (B) whether the petitioner was
ordered removed under [§ 1225(b)(1) ], and (C) whether the
petitioner can prove ... that the petitioner is [a lawful
permanent resident], has been admitted as a refugee ... or
has been granted asylum ....  Id. § 1252(e)(2).  Section
1252(e) also provides jurisdiction to the district court
for the District of Columbia to review "[c]hallenges [to
the] validity of the [expedited removal] system." Id. §
1252(e)(3)(A).  Such systemic challenges include challenges
to the constitutionality of any provision of the expedited
removal statute or its implementing regulations, as well as
challenges claiming that a given regulation is inconsistent
with law.  See id. § 1252(e)(3)(A)(i) & (ii).
Nevertheless, systemic challenges must be brought within
sixty days after implementation of the challenged statute
or regulation.  Id. § 1252(e)(3)(B).

Castro v. United States Department of Homeland Security, 835
F.3d 422, 426–27 (3d Cir. 2016).  Plaintiffs do not dispute the
law set forth in Castro and that they do not meet the narrow
exceptions in § 1252(e)(2), or that they did not bring their
challenge within 60 days in the District of Columbia.  They
argue, however, that they "are not seeking declaratory,
injunctive, or equitable relief on the expedited removal order
as it pertains to Contreras.  Instead, Plaintiffs seek relief
and/or damages for Defendants' violations of Plaintiffs'
constitutionally protected rights."

It appears to the Court that the essence of Plaintiffs' claims
seek the judicial determination that Contreras' removal was
improper.  See, e.g., Plaintiff's Complaint, Docket No. 1 at 55
("Plaintiffs respectfully ask the Court to . . . . 2. Review the
denial of Contreras' F-1 nonimmigrant student visa; . . . Remove
Contreras' five (5) year ban on reentry and allow her to reenter
the United States upon presentment of said revalidated and
reinstated F-1 nonimmigrant student visa and Form I-20.").  The
Court also notes the paradox that even though Contreras herself
cannot seek judicial review of her removal under 8 U.S.C. §

Plaintiffs' claims - and the basis for their "injury" to their "property" and "liberty" interests caused by Defendants - hinge on their contention that their sponsorship of, and grant of scholarship to, Contreras is a requirement of an F-1 nonimmigrant student visa.  See Plaintiffs' Complaint, Docket No. 1 at 28-29, ¶ 77 ("[A]ll United States colleges and universities require international students to find, or be paired with, sponsors to participate in student visa programs. Accordingly, Contreras was required to find a sponsor family in the United States and provide ACCC with their contact information."; Plaintiffs' Opposition Brief, Docket No. 11 at 14-15 ("ACCC's 2018-2019 catalog unequivocally states that 'F-1 and international students must adhere to all Federal regulations set by the U.S. government' and that F-1 applicants 'must submit: . . . (a) completed Sponsorship Agreement form and Supplemental Form'.  Upon information and belief, the same is true of hundreds of other colleges and universities around the United States . . . . [I]t would appear that the term 'sponsor' not only has legal significance, it is a requirement for a

---

1252(a)(2)(A)(iii), Plaintiffs endeavor to.  Nevertheless, the Court recognizes that Plaintiffs have attempted to assert claims based on what they profess to be their own property and liberty interests separate from Contreras' interests.  In light of the lack of standing to assert the claims they do bring, the Court need not assess the viability of this additional asserted defect in Plaintiffs' complaint.

majority of visa applicants wishing to overcome Defendants' 'public charge' inadmissibility grounds.").

Plaintiffs contend that because they served as Contreras' required sponsor, Contreras' unlawful expedited removal unconstitutionally deprived them of their property and liberty interest – i.e., the monies paid to Contreras, and their right to contest through proper due process the determination that Contreras was their employee.  See Plaintiffs' Complaint, Docket No. 1 at 55, ¶ 169 ("Plaintiffs maintain Defendants violated their liberty interests to sponsor the F-1 student visa holder, and potential STEM OPT participant of their choosing, without due process of law."); id. at 57, ¶ 173 ("Plaintiffs' vested scholarship and sponsorship monies, required by the F-1 student visa program and ACCC sponsorship agreements, were lost when Defendants denied Contreras' F-1 nonimmigrant student visa without due process of law."); id. at 59, ¶ 179 ("Plaintiff contend that they, without notice or opportunity to defend, were accused by Defendants of engaging in the unlawful employment of an alien student, by allegedly providing partial tuition, sponsorship, and room and board as 'fee-for-service,' without due process of law.").

Among other relief, Plaintiffs seek the return of the money they expended and the declaration that they are not Contreras' "employers."  See Plaintiffs' Complaint, Docket No. 1 at 55, ¶ 6

22

("Correct all pertinent government records to reflect Plaintiffs were Contreras' sponsors and not employers."); id. ¶ 11 ("Award Plaintiffs lost scholarship and sponsorship monies . . . .").

Plaintiffs' allegations do not present a cognizable "concrete and particularized" invasion of a "legally protected interest" redressable by this Court. Accordingly, they lack standing to bring their claims.[5] Even though Plaintiffs describe their contribution to Contreras' education expenses as a requirement for her F-1 nonimmigrant student visa, they cite to no law or regulation that supports their position. Indeed, the laws, regulations, and documents they cite confirm the contrary.

Plaintiffs first cite to I.N.A. § 214.2(f)(4)(i), 8 C.F.R. § 214.2(f), which outlines the requirements for

---

[5] A finding that Plaintiffs have standing, under Article III's case-or-controversy requirement or under prudential considerations, is a requirement for each of their claims. Warth v. Seldin, 422 U.S. 490, 517–18 (1975) ("[T]he rules of standing, whether as aspects of the Art. III case or controversy requirement or as reflections of prudential considerations defining and limiting the role of courts, are threshold determinations of the propriety of judicial intervention."); Township of Belleville v. Federal Transit Admin., 30 F. Supp. 2d 782, 790 (D.N.J. 1998) (quoting National Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479 (1998)) ("[T]he Supreme Court has interpreted the Administrative Procedure Act (APA), 5 U.S.C. § 702 et seq., "to impose a prudential standing requirement in addition to the requirement[ ] imposed by Article III of the Constitution."); Lichtman v. U.S., 316 F. App'x 116, 119 (3d Cir. 2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)) (holding that the plaintiff could not maintain her claim under the Mandamus Act, 28 U.S.C. § 1361, because she failed to demonstrate a judicially cognizable injury in fact).

admission under an F-1 nonimmigrant student visa:

> A nonimmigrant student may be admitted into the United
> States in nonimmigrant status under section 101(a)(15)(F)
> of the Act, if:
>
>> (A) The student presents a SEVIS Form I-20 issued in
>> his or her own name by a school approved by the
>> Service for attendance by F-1 foreign students . . . ;
>>
>> (B) The student has documentary evidence of financial
>> support in the amount indicated on the SEVIS Form I-20
>> . . .;
>>
>> (C) For students seeking initial admission only, the
>> student intends to attend the school specified in the
>> student's visa . . . .

(Docket No. 1 at 5-6.)

Plaintiffs next cite the U.S. Department of State website
to show that Defendants' "F-1 student visa program promotional
materials highlight a sponsor's ability to pay for tuition
costs." (Docket No. 1 at 9, ¶ 21.) Plaintiffs quote a section
of the website:

> Can organizations or individuals sponsor an F-1 student to
> attend public secondary school?
>
> Yes. Nothing in the law prevents an organization or an
> individual from paying the full tuition costs for the
> student. However, the payment cannot come from public
> funds. The student must still show that he or she has
> sufficient funds to cover education and living expenses
> while in the United States.
>
> (https://travel.state.gov/content/travel/en/us-
> visas/study/student-visa/foreign-students-in-public-
> schools.html)

(Id.)

Plaintiffs further cite to United States tax laws regarding

the nature of grants and scholarships.  Plaintiffs point out
that Fife's payment to Contreras and the Foundation's
scholarship to Contreras were non-taxable, and "were neither
income nor fee-for-service to their student designee and
complied with all applicable I.N.A. and IRS conditions and
requirements."  (Id. at 10-11.)

Plaintiffs then cite to Contreras' SEVIS Form I-20 from
ACCA and the documents Fife was required to sign as a part of
his sponsorship, which are detailed above, see supra pages 3-4,
to support their claim that "Upon information and belief, all
United States colleges and universities require international
students to find, or be paired with, sponsors to participate in
student visa programs."  (Id. at 28, ¶ 77.)

In their brief in opposition to Defendants' motion to
dismiss, Plaintiffs refer to DHS's "Final Rule regarding
Inadmissibility on Public Charge Grounds," which provides that
"at the time of the application for a nonimmigrant visa, the
alien must demonstrate to DOS that he or she is not likely at
any time in the future to become a public charge.  Similarly, at
the time a nonimmigrant applies for admission, he or she must
demonstrate to CBP that he or she is not likely at any time in
the future to become a public charge."  (Docket No. 11 at 14,
citing 84 F.R. 41292 at 41331).

Based on the foregoing references, Plaintiffs assert that

"Defendants violated their property interests while sponsoring an F-1 student visa holder, and potential STEM OPT participant of their choosing, without providing them with procedural due process," and that "Plaintiffs' vested scholarship and sponsorship monies, required by the F-1 student visa program and ACCC sponsorship agreements, were lost when Defendants denied Contreras' F-1 nonimmigrant student visa without due process of law." (Docket No. 1 at 57.)

Plaintiffs' reliance on the above-cited material dooms their contention that they held a property interest in Contreras' F-1 visa because of their scholarship and sponsorship of Contreras. The INS regulations, the U.S. Department of State website, the Form I-20, and the DHS's "public charge" rule all concern the requirement that the F-1 nonimmigrant student visa applicant has the financial means to pay for her education and living expenses while attending school in the United States. None of these references support Plaintiffs' contention that a F-1 nonimmigrant student visa applicant must have a sponsor or a scholarship in order to obtain such a visa:

- The INS regulations only require that "the student has documentary evidence of financial support in the amount indicated on the SEVIS Form I-20."

- On the U.S. Department of State website, the plain reading of the answer to the question of whether an organization

26

or individual can sponsor an F-1 visa student is that they *may*, not *must*, have a sponsor, but the F-1 visa student is ultimately responsible for proving her ability to pay for her education and living expenses.[6]

   • ACCC's Confidential Information Statement for International Students specifically states that an F-1 nonimmigrant student visa applicant must verify her financial ability to study in the United States and identify all her funding sources, including whether she has a sponsor or scholarship, but the form does not require that the international student have a sponsor or scholarship if she does not have or need one.

   • The F-1 nonimmigrant student visa certificate of eligibility lists all funding sources, and it specifically relates: "10. Financial Support. You must demonstrate that you are financially able to support yourself for the entire period of stay in the United States while pursuing a full course of study. You are required to attach documentary evidence of means of support." (Docket No. 1-1 at 35.)  It does not require an F-1 visa applicant to have a sponsor.

   • The DHS's concern that an F-1 visa holder may become

---

[6] The Court notes that this information concerns foreign students who wish to attend public high school in the United States - not post-secondary institutions, such as ACCC.

financially dependent on the U.S. government while studying in the United States only requires that the nonimmigrant student demonstrate that "she is not likely at any time in the future to become a public charge," and not that she have a sponsor who will pay some or all of her obligations.

Despite the absence of any requirement that an F-1 nonimmigrant student visa applicant obtain a sponsor in order to qualify for the visa, and despite the fact that Plaintiffs gratuitously provided financial assistance to Contreras, Plaintiffs profess they were injured when Contreras' visa was voided and, essentially, they were not refunded the sponsorship and scholarship money they expended to help Contreras obtain the F-1 student visa.  This is not an invasion of a "legally protected interest" redressable by this Court.

Contreras might not have been financially able to obtain her F-1 nonimmigrant student visa without Plaintiffs' financial support.  That fact, however, does not confer a property interest in Contreras' F-1 student visa to Plaintiffs simply because they gratuitously provided funds to permit Contreras to certify her ability to pay for her education and living expenses.  The fulfillment and maintenance of all the requirements of the F-1 student visa was solely Contreras' obligation, and the CBP's determination that she did not fulfill and maintain those requirements spoke only to Contreras, and not

Plaintiffs.  The loss of Contreras' visa may have affected
Plaintiffs, but not because they were harmed in a concrete and
particularized way by Defendants' conduct but rather because of
their own voluntary assumption of certain risks.

Moreover, this Court cannot provide Plaintiffs with the
relief they seek of the reimbursement of their sponsorship funds
and scholarship money.  Plaintiffs plainly state in their
complaint that the money they provided to Contreras was for her
education and associated living expenses, and they did not
expect anything in return.  (Docket No. 1 at 47, ¶ 138, stating
that when Fife paid Contreras' tuition, he "was to receive
nothing in return"; id. at 10-11, stating that Fife's payment to
Contreras and the Foundation's scholarship to Contreras were
non-taxable, and "were neither income nor fee-for-service to
their student designee and complied with all applicable I.N.A.
and IRS conditions and requirements".)  Nothing in the laws,
regulations, or agreements cited by Plaintiffs show that any
failure by Contreras to meet one or more of the requirements to
maintain her F-1 nonimmigrant student visa, as determined by the
CBP, would result in a refund of Plaintiffs' gratuitous payments
to Contreras.

To be sure, Plaintiffs would be hard pressed to argue that
they would be entitled to the reimbursement of their grants to
Contreras if her expedited removal were based on a different

29

reason that Plaintiffs could not refute, for example if
Contreras were convicted of a crime.[7]  The Court does not suggest
Contreras engaged in any criminal conduct, but such a
hypothetical drives home the point that Plaintiffs present no
authority for the position that the U.S. government will refund
a gratuitous sponsorship of a foreign student if it is
determined that the foreign student no longer meets the criteria
for participation in the F-1 nonimmigrant student visa program.
This Court cannot provide to Plaintiffs a remedy that does not
exist.

Similarly, Plaintiffs' volunteer status as donors to
Contreras' education expenses does not confer a liberty interest
in the CBP's assessment of Contreras' status relative to the F-1
nonimmigrant student visa requirement that Contreras cannot be
employed while holding the F-1 student visa.  Plaintiffs claim
that their constitutional rights were violated when CBP officers
erroneously concluded that Contreras served as Fife's
housekeeper, which violated one of the conditions of the F-1

---

[7] See 8 C.F.R. § 214.1(g) ("Criminal activity.  A condition of a
nonimmigrant's admission and continued stay in the United States
is obedience to all laws of United States jurisdictions which
prohibit the commission of crimes of violence and for which a
sentence of more than one year imprisonment may be imposed. A
nonimmigrant's conviction in a jurisdiction in the United States
for a crime of violence for which a sentence of more than one
year imprisonment may be imposed (regardless of whether such
sentence is in fact imposed) constitutes a failure to maintain
status under section 241(a)(1)(C)(i) of the Act.").

nonimmigrant student visa.  Plaintiffs present various procedures the CBP officers should have followed, and they ask this Court to direct Defendants to reverse their determination and find that Contreras did not work for Plaintiffs.

In addition to their lack of standing on constitutional grounds because they do not have a property interest in the status of Contreras' visa, Plaintiffs' claims of liberty interest violations cannot be maintained on prudential grounds. "Prudential standing entails an inquiry into a plaintiff's role because [t]he aim of this form of judicial self-governance is to determine whether the plaintiff is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. . . .  We therefore use the prudential limits of standing to ensure that only those parties who can best pursue a particular claim will gain access to the courts." Oxford Associates v. Waste System Authority of Eastern Montgomery County, 271 F.3d 140, 145–46 (3d Cir. 2001) (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 n.8 (1986); Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 99–100 (1979)) (other citations and quotations omitted).

The test for assessing whether a party satisfies prudential standing is (1) whether a litigant asserts his or her own legal interests rather than those of third parties, (2) that a court should refrain from adjudicating abstract questions of wide

public significance which amount to generalized grievances, and (3) whether a litigant demonstrates that her interests are arguably within the zone of interests intended to be protected by the statute, rule or constitutional provision on which the claim is based.  Id. (citations omitted).

In this case, Plaintiffs advocate for change in the process and procedure in the event an F-1 nonimmigrant student visa holder is detained upon entry and assessed to be non-compliant with the conditions of the visa,[8] and they request that this

---

[8] See Docket No. 1 at 42 ¶ 131 ("[F]amily living and immersion into the culture of the United States is one of the many stated goals of the F-1 nonimmigrant visa program. If Defendants regard such cultural exchanges as 'fee-for-service' employment, then Plaintiffs should have been given advance notice of precisely what cultural and/or host family activities were prohibited pursuant to the I.N.A. and Defendants' internal guidelines. An explicit list of banned cultural and/or host family activities should have also been included in Defendants' distributed F-1 nonimmigrant visa program materials and posted to Defendants' internet resources. Additionally, advance notice of banned cultural and/or host family activities should have been given to Plaintiffs by DHS-appointed SEVP member educational institutions, such as on ACCC's Sponsorship Agreement Form for International Students, the Confidential Financial Statement for International Students, and the Sponsor's Affidavit of Free Room and Board."); id. at 50-51 ¶ 151 ("Even if Houston CBP had concerns regarding the validity of Contreras' SEVIS status or ACCC enrollment, they should have still admitted her via Port Parole under I.N.A. § 212(d)(5) or after issuing a Form I-515A - Notice to Student or Exchange Visitor. Furthermore, Defendants had due process obligations to provide Plaintiffs with a hearing, held perhaps thirty (30) days after the student designee's temporary admission date, to review the alleged grounds for inadmissibility. Such a process would have allowed Plaintiffs to meet with their student designee and counsel, acquire relevant supporting documents, and draft responsive submissions supporting the legal basis for the requested

32

Court declare the current process and procedures
unconstitutional on various bases.  Additionally, Plaintiffs
request that this Court rewind time back to Contreras'
detainment in Houston on July 29, 2017, and not only reverse the
CBP's finding that Contreras violated the terms of her F-1
nonimmigrant student visa, but direct the contrary conclusion,
rather than provide CBP with an opportunity to provide the due
process Plaintiffs allege was withheld.

In addition to their request for relief specific to them,
Plaintiffs' sweeping request for change to the national
immigration system and the process and procedures at the
nation's borders directly implicates the prudential
considerations which constrain this Court from granting such
relief.[9]  "The command to guard jealously and exercise rarely [a

---

admission. A hearing, held a short time after Port Parole or
service of Form I-515A, would have allowed Plaintiffs and
Defendants opportunity to prepare and deliberate without the
inconvenience, stress, and time restraints of hasty decisions
made at a port-of-entry.").

[9] The Court notes,

> The United States' immigration framework is a complex body
> of laws that places various restrictions on nonimmigrants--
> including students . . . .  At the core of U.S. immigration
> law is one crucial presumption: that noncitizens seeking
> admission are presumed to be immigrants.  To rebut the
> presumption, noncitizens must show that they qualify as
> nonimmigrants and must fit into one of the many categories
> of nonimmigrant laid out in section 101(a)(15) of the INA.
> A nonimmigrant seeking admission must overcome two separate
> hurdles: (1) the nonimmigrant must fit into one of the

court's] power to make constitutional pronouncements requires strictest adherence when matters of great national significance are at stake." Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 11 (2004). "[P]rudential standing encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Id. (citations omitted). "Without such limitations - closely related to Art. III concerns but essentially matters of judicial self-governance - the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." Id.

Even though Plaintiffs endeavor to cast their claims as

---

statutory nonimmigrant categories and (2) the nonimmigrant must avoid various affirmative grounds of inadmissibility. The system is laborious and strict, ensuring that only those authorized to enter may remain in the United States. Once nonimmigrants have validly entered, they must adhere to more rules to avoid removal for violating their visa status.

Pia Nitzschke, Note, *Building Bridges: Why Expanding Optional Practical Training is a Valid Exercise of Agency Authority and How it Helps F-1 Students Transition to H-1b Worker Status*, 66 Am. U. L. Rev. 593, 601 (2006).

harm done to them, Plaintiffs' claims are, at their core, those of Contreras and other similarly situated nonimmigrant students seeking to attend college in the United States.  The relief Plaintiffs seek must be advanced to the proper audience, such as the legislative branch, which has the ability to modify the laws and procedures in the manner advocated by Plaintiffs.[10]

In short, the status of Contreras' F-1 nonimmigrant student visa is solely the "interest" of Contreras - not Plaintiffs.[11]

---

[10] The Third Circuit has explained:

> Congress has [] provided for a separate form of removal, known as "expedited removal," which permits the accelerated removal of aliens who, according to immigration officers, meet a set of statutorily determined criteria. . . . Aside from an asylum interview, such aliens are afforded no procedural protections, let alone the various procedural safeguards of standard removal proceedings. . . . [T]he INA tightly constrains judicial review of expedited removal orders, stripping federal courts of jurisdiction to review such orders except on three narrow grounds. . . .  [T]he statute specifies that the inquiry into whether a petitioner was "ordered removed" may address only "whether such an order in fact was issued and whether it relates to the petitioner."  It also bars review of any claim "arising from or relating to the implementation or operation of an order of removal pursuant to [the expedited removal provision]."

Osorio-Martinez v. Attorney General United States of America, 893 F.3d 153, 162-63 (3d Cir. 2018) (internal citations omitted).

[11] This Court does not speak to whether an F-1 nonimmigrant student visa holder does or does not hold a constitutionally protected property or liberty interest in that visa, but only that Plaintiffs have not "alleg[e] such a personal stake in the outcome of the controversy as to ... justify [the] exercise of the court's remedial powers on [their] behalf."  Town of

Plaintiffs may have been part of the process that provided the means for Contreras to meet the requirements to obtain and maintain that visa, and Plaintiffs may have been personally affected by the approval of, and the voiding of, the visa and Contreras' removal from the United States.  But as mere "bystanders" to Contreras' visa status, they lack standing to contest the manner and substance of the determination to cancel Contreras' visa and effect her immediate removal.  Their remedies lay elsewhere than in this Court.  See Diamond v. Charles, 476 U.S. 54, 62 (1986) ("The exercise of judicial power can so profoundly affect the lives, liberty, and property of those to whom it extends, that the decision to seek review must be placed in the hands of those who have a direct stake in the outcome.  It is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests." (quotations, citations, and alterations omitted)).

## CONCLUSION

"[S]tanding is generally an inquiry about the plaintiff: is this the right person to bring this claim." Davis v. Wells Fargo, 824 F.3d 333, 348 (3d Cir. 2016) (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)).  "'If a dispute is not a proper case

---

Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (U.S. 2017) (citation omitted).

or controversy, the courts have no business deciding it . . . .'"

Common Cause of Pennsylvania, 558 F.3d at 257 (quoting

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006)).

Plaintiffs here are not the right persons to bring their claims regarding the voiding of Contreras' F-1 nonimmigrant student visa, her expedited removal, and her five-year ban on reentry.  Plaintiffs have also sought relief regarding the policies and procedures of the nation's immigration system and border patrol that this Court cannot provide.  Because Plaintiffs' complaint does not present a proper case or controversy, this Court has "no business deciding it."

Consequently, because Plaintiffs have not met their burden of establishing their standing, they have failed to establish this Court's subject matter jurisdiction over their action. Defendants' motion to dismiss must be granted, and Plaintiffs' motion to stay Contreras' five-year bar must be denied as moot.

An appropriate Order will be entered.


Date:   June 29, 2020              s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.


37